UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

PATRICK SMITH,

                     Petitioner,             07 Civ. 2966

   -against-                         <u>OPINION</u>

BRIAN FISCHER, Superintendent,

                     Respondent.

------------------------------------X

A P P E A R A N C E S:

      <u>Attorney for Petitioner</u>

      EPSTEIN & WEIL
      225 Broadway, Suite 1203
      New York, NY  10007
      By:  Lloyd Epstein, Esq.

      <u>Attorney for Respondent</u>

      BRONX COUNTY DISTRICT ATTORNEY'S OFFICE
      198 East 161st Street
      Bronx, NY  10451
      By:  Robert Johnson, Esq.
           Jason Whitehead, Esq.
           Allen Saperstein, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3 5 12

**Sweet, D.J.**

Petitioner Patrick Smith ("Smith" or the "Petitioner") has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which has been opposed by respondent Superintendent Brian Fischer (the "Respondent" or the "State").

The instant matter centers on the testimony of an informant in Petitioner's criminal trial. The issues presented here are whether (1) Petitioner's trial counsel provided ineffective assistance by failing to seek a hearing with respect to the informant, pursuant to Massiah v. United States, 377 U.S. 201 (1964), or to preclude the confessions prior to opening statements, pursuant to People v. Rosario, 213 N.Y.S.2d 448, 9 N.Y.2d 286, 289 (1961) and New York Criminal Procedure Law ("NYCPL") § 240.45, or (2) Petitioner was deprived of due process by statements made by the state prosecutor with regard to the informant and the informant's testimony.

Based on the conclusions set forth below, the petition is denied.

1

# I. Prior Proceedings

By an indictment filed on or about June 5, 2002, a Bronx County Grand Jury charged Petitioner and Kevin Alston ("Alston") with first-degree murder (in the course of a robbery), second-degree murder (intentional and felony murder), first-degree manslaughter, first-degree robbery (armed), and second-degree weapons possession. Prior to trial, defense counsel successfully moved to dismiss four counts of the indictment on statute of limitations grounds and to preclude the use of Petitioner's statement to the police.

On November 18, 2003, the state prosecutor, Ms. Scaccia, announced that she intended to call an informant to testify regarding conversations the two men had while they were incarcerated together at Rikers Island, including that Smith indicated to Ferguson that he participated in the crime. (Tr1. 6-7.)[1] Prompted by this disclosure, the trial judge, Justice

---

[1]     The trial transcripts are not paginated consecutively and so are denoted by volume, with volume one, pretrial proceedings, denoted Tr1. [page number], volume two, trial proceedings, denoted Tr2., and volume three, sentencing proceedings, denoted Tr.3. The docket number and dates of the transcript volumes are as follows:  Tr1. (Dkt. No. 23) (November 18, 2003);

Thomas A. Farber, asked the prosecutor whether "[a]t this point, it's your representation that he is not an agent. He was not sent by you or police or anybody else?" (Id.)   The prosecutor responded "No."   (Tr1. 7).

Prior to opening statements, on Thursday November 20, 2003, the Court again inquired regarding the informant as follows:

> THE COURT: My understanding is that we still have the matter of the potential witness who is currently incarcerated and we don't have all the information that we need for him; is that right, Miss Scaccia?
>
> MS. SCACCIA: That's correct. I have enough information that I have been able to put in a request for his rap sheet. I do need to speak to the detective that he contacted to determine whether there was any sort of confidential informant relationship between him and this detective or if it was just somebody that he had a working relationship with.
>
> THE COURT: But based on our discussion yesterday, you will not refer to him in your opening and there will be no need to mention that in connection with any of the witnesses who testify today. . . .
>
> MS. SCACCIA: That's correct.
>
> THE COURT: And so Mr. Bendish, so long as we have that by tomorrow, that's satisfactory.
>
> MR. BENDISH (defense counsel): Yes, your Honor.   I think, Judge, the record should also reflect Miss

---

Tr2. (Dkt. No. 24, 25, 26, 27) (Nov. 20-21, 2003; Nov. 21, 24-25, 2003; Nov. 26, 2003; Dec. 1-3, 2003); Tr3. (Dkt. No. 28) (Dec. 22, 2003).

> Scaccia gave me Grand Jury minutes which I had not
> received and also rep sheets of the witnesses that she
> intends to call.  So I believe other than the inmate,
> I think she has completed Rosario obligations.
>
> THE COURT: Obviously, if any issues arise, we will
> deal with them as they come up.  It's always nice when
> there aren't since Rosario obligation does commence
> right about now.

(T2. 3-4.)

Following opening statements the same day, defense counsel, Mr. Bendish, requested an outer time frame for a decision regarding whether the State was going to call the informant, later identified as William Ferguson ("Ferguson"), and that he did not "want it to be like they give it to me in the morning and he is taking the stand in an hour and a half." (Tr. 37.)  The prosecutor stated that the informant would not be testifying before the next week. (Id.) The Court responded, "I assume that you will have all the information tomorrow; right. There is no reason why you shouldn't."  (Id.)  The prosecutor stated that "[t]he only thing I may not have by tomorrow is Detective Dellasandro's[2] position as to whether or not he was a C.I." (Tr2. 37.)  The Court assured defense counsel that he would have the name of the informant and his rap sheet by the next day, November 21, 2003.  The prosecutor said she would

---

[2]    The detective's name is spelled in a variety of ways throughout the transcripts and by the parties.  The Court adopts "Dellasandro" for ease and has altered quotations from the transcripts accordingly.

4

probably not be able to meet with the detective until the next Monday or Tuesday, November 24 or 25, and defense counsel expressed concern that he might not be informed of the State's decision as to whether she would call the informant until after that point. (Tr. 37-38.) The Court responded that the prosecutor would know "on Monday whether there is any reason to believe that the [informant] is a C.I. or is getting a benefit of any kind for testifying or is a agent or anything like that. And then we will deal with it." (Tr. 38.) Defense counsel accepted this outcome, saying "[o]kay." (Id.)

The following Monday November 24, the prosecutor disclosed what she stated was the informant's complete rap sheet. (T2. 221.) She stated that she had been unable to contact Detective Dellasandro ("Dellasandro"), whom the informant had initially contacted, and that she did "not believe at this point just from looking at his rap sheets that he was a confidential informant but I am obviously not going on what I believe. I will find out for sure and tell counsel." (Id.) Defense counsel acknowledged receipt of the rap sheet and asked "that if there were any notes taken of his interview or interviews by either Detective Tracy or any other detective or the Assistant D.A. that they be turned over as soon as

5

possible." (Id.) The Court responded, "[c]learly, I am not going to permit you to call him until we are satisfied that everything is turned over well ahead of time." (Id.) The prosecutor confirmed this, stating "Absolutely." (Id.)

At the end of the eyewitness testimony, defense counsel asked, if the State called Ferguson, for "affirmative proof" that the informant was not "an agent." (T2. 391.) The Court stated, "I believe that you are prepared to make that representation, is that correct?" (Id.) The following colloquy then took place:

> MS. SCACCIA: Absolutely, that he was clearly not an agent and he was not sent in there to speak in any way with the defendant by the police or by our office. And, in fact, that he contacted, he contacted the Police Department who then contacted Detective Tracy, this case detective, because he was the one assigned to the case. I have not even, at this point, met Mr. Ferguson. I did not send him in there. He is not a registered confidential informant.
>
> THE COURT: Do we know how it is that he came in contact with the detective he came in contact with? Why he called him as opposed to any other detective?
>
> MS. SCACCIA: The detective that he called is a detective by the name of Dellasandro. And I believe that Detective Dellasandro has been involved with him regarding Brooklyn arrests. I mean he reached out to him because he obviously knew who he was. I don't know, I know that he's not his confidential informant. If he knows him it's because he's locked him up on one of his 26 arrests or because he works, he lives, or is

known to frequent the precinct, that I can't answer you, but he reached out to the police.

MR. BENDISH:  Judge, again, I am not, I am speaking from a little bit without knowing how many times this guy allegedly even talked to my client.  I mean I don't have any idea whether, you know, he went in there once and he might have called this guy and the guy said, well, when you see him again, ask him about – I don't know.  I have no idea, so I'm asking before we actually put him on the stand that we have some definitive statement by the prosecutor.  And I am not asking for it now because I recognize she hasn't talked to the guy but it seems to me that she hasn't talked to the Brooklyn detective either so . . .

MS. SCACCIA:  It's my understanding that the call was made by the inmate to the detective.  After that call was made to the Brooklyn Detective Dellasandro, he reached out for Detective Tracy.  Detective Tracy then went and spoke to Mr. Ferguson himself.  I believe it was the following day.

THE COURT:  Okay and did Detective Dellasandro take any notes about this?  He must have.

MS. SCACCIA:  Detective Dellasandro?

THE COURT:  Yes.

MS. SCACCIA:  That I don't want to say.  I don't know the answer to that.

THE COURT:  Do you have Detective Dellasandro coming in tomorrow?

MS. SCACCIA:  I did not, no.

MR. BENDISH:  There's a gap there.  I don't know how Dellasandro all of a sudden would come up with Tracy.

THE COURT:  That's not, I mean he finds out who the homicide investigator detective is.

MR. BENDISH:  Again, Judge, I am not asking for answers now, but it would seem to me that we are not

7

even sure how many times they're saying he allegedly spoke to the client.   Obviously, if it's more than once, that there may be, that he was sent in the second time and either at the suggestion --

MS. SCACCIA:   He wasn't sent in.   That's the whole issue, he wasn't sent in.   If I were to send him in --

MR. BENDISH:   The Assistant D.A. is speaking without any personal knowledge of that, so I am asking for an offer of proof so that we can have somebody to say that.

MS. SCACCIA:   Actually, I am speaking not out of turn because when I became aware of this, there was some question by the detective, my detective, to me and from Dellasandro, is there anything we can do to send him in there?   And you know what, it was my choice not to try to have anybody wired up or put in the microphone room because unless the person just sat there as a mute and let Mr. Smith do the talking then he would be acting as my agent, and I wouldn't be able to use that statement any way the conversation had taken place.   No further steps were taken to send Mr. Ferguson back in as a plan to try to get either defendant.   He made the statements to the defendant. Counsel has a position that these were not statements made by the defendant but rather this was found out by the other inmate by going through paperwork.   That's his position.   He is allowed to have it.   That is not the sense I am getting from the conversations my detective had with the individual.   I will be in this courthouse by probably 9:30, 9:45 tomorrow awaiting Mr. Ferguson's arrival because I mean he is incarcerated. . . . As soon as he gets here, I want to speak to him.   As soon as I speak to him, I will run down prior to 11:30 and I will tell counsel everything I have found out.

MR. BENDISH:   Again, Judge, I am just, I have no problem with that, but as long as there's an offer of proof before he physically takes the stand, and then we will go from there.

THE COURT:   All right, we can do that.   It does occur to me that it's not unlikely that when an inmate calls

8

a detective, that the detective has his pen out.   I
mean it would be rather foolish, it seems to me, even
in light of Rosario rules for a detective on a
telephone call like this not to at least write down
some information.

MS. SCACCIA:   I am pretty certain he had to write at
least Patrick Smith down someplace so he could
remember who it was when he was calling around to the
case detective.

MR. BENDISH:   Wouldn't I be entitled to that?   That's
why I don't understand where the gap is if there's an
unknown detective in Brooklyn who somehow has a prior
connection to this guy.

THE COURT:   I think you ought to be speaking to
Detective Dellasandro.

MS. SCACCIA:   I will.   I will.   And if need be, I will
get him here for these purposes, or I will have him
fax his notes.   I will get as much information as I
possibly can.

THE COURT:   Okay.   If we need to, we can put Detective
Tracy on at 11:30 and call the inmate after lunch.

MR. BENDISH:      Again, I have no problem.   Just, I
will put on the record now that I want an offer of
proof.   I understand that we're going to do [it] in
the morning.

MS. SCACCIA:   An offer of proof that what the inmate
would say?

MR. BENDISH:      I think it's incumbent upon the
prosecutor to say that I talked to people and I have
firsthand knowledge other than double hearsay.   She
never talked to anybody.   She hasn't hasn't (sic)
talked to the inmates.   So her statements, while I
have no reason to believe they are not accurate at
this point, I ask for an offer of proof and for them
to call this witness, there has to be more on the
record.

THE COURT:  Okay.  Obviously, Miss Scaccia is not
going to call the witness unless she knows that she
actually heard or believed in good faith that he heard
something directly from Mr. Smith but you have to make
whatever inquiry you have to make in person to rule
out any Rosario or agent problems.

(Tr2. 391-97.)

The next day the prosecutor reported that she had
spoken with Detective Dellasandro and learned that Ferguson
called Detective Dellasandro and told him that Patrick Smith had
told him about a robbery homicide. (Tr2. 404.)  Dellasandro,
according to the prosecutor, looked up Smith in the computer and
determined that Detective Tracy was in charge of Smith's case
and reached out to him on October 21, 2003.  (Tr2. 405.)  Tracy
returned his call the next day, October 22, 2003, and that day
Dellasandro and Tracy went to Rikers Island and spoke with
Ferguson. (Tr2. 405.)  Neither officer made any notes of the
interview, and according to the prosecutor, that was the first
and last conversation that Ferguson had with Tracy prior to
trial.  (Tr2. 405).  She asserted that Ferguson "knew of
Detective Dellasandro but this witness was not a confidential
informant."  (Tr2. 406.)

The prosecutor acknowledged that Ferguson had provided
law enforcement with information in the past, but that the only

10

prior instance concerned a murder, and that the information never went anywhere. (Tr2. 408.)    Defense counsel repeatedly stated that he would like to know how accurate the information was that Ferguson previously provided and whether Ferguson's previous statements to the police were made to Dellasandro. (Tr. 408-11.)    After a discussion, the trial judge concluded that his understanding was that the only time Ferguson had provided information in the past was "in connection with an incident [wherein] he acted more or less as conduit as opposed to giving his own information," but the court was not clear whether Ferguson provided that information to Dellasandro. (Tr2. 411.)    The prosecutor briefly left the courtroom to speak to Ferguson.    (Tr2. 411.)    When she returned, Scaccia explained that, according to Ferguson, in 2001 while he was incarcerated, another inmate approached him about killing that inmate's wife. Ferguson then reached out to Detective Lanigan, who he had grown up with, and Lanigan introduced him to Detective Dellasandro, Lanigan's partner.    (Tr2. 412.)    Ferguson was then removed from the situation and an undercover officer was introduced to the inmate who had spoken about the murder.    (Tr2. 412.)    However, Ferguson was not called upon to testify and received no benefit. (Id.)

11

Based on the prosecution's representations, the Court
determined that "[t]here is no indication on the record that
this individual is engaged as an agent with the People or police
or state in any way . . . ." (Tr2. 413.)   Defense counsel
stated, "I assum[e] the representations made by the inmate to
prosecution is correct.  I will have to live with that."  (Id.)
The Court responded "I agree.  So right now it's basically on
you for cross-examination and if something comes out that
changes what we know, there will be consequences that we will
have to deal with then up to and including mistrial.  But at
this point, there is no reason to suspect that's going to
happen."  (Id.)


At trial, Ferguson testified that Smith and he first
met at the Rikers Island medical clinic several weeks before the
trial.   (Tr2. 421.)   At that first meeting, the men had a five
or ten minute conversation in which Smith told Ferguson what he
was charged with. (Tr2. 496.)


Ferguson testified that he met with Smith on three
consecutive evenings later that week, on Thursday, Friday, and
Saturday (October 23, 24, and 25, 2003). (Tr2. 445-6.)  On each
of these occasions, Ferguson was in the law library and asked a

12

corrections officer to bring Smith down to the library, which Ferguson testified he was able to make possible because he had a job at Rikers and the corrections officer would accommodate him. (T2. 443.) Ferguson testified that following the second meeting (the first in the law library), which he stated occurred on a Thursday (October 23), he contacted Detective Dellasandro. (Tr2. 509-12.)  However, Detective Tracy testified that he and Detective Dellasandro met with Ferguson on Wednesday, October 22. (Tr2. 591-93.)  The trial testimony thus conflicts as to the timing of Ferguson's meeting with the police.

Ferguson testified that Tracy, Dellasandro, and two other detectives interviewed him regarding Smith and asked him if he would testify, and Ferguson agreed. (Tr2. 449-53.)  He stated that neither the police nor the Assistant District Attorney asked him to attempt to get Smith to speak or take any of his paperwork or act as an informant in any way, and that he was receiving no benefit from his testimony.  (Tr2. 451-52.)

Ferguson testified that the first library meeting occurred three or four days after the clinic meeting, when Ferguson had Smith called to the law library where he was preparing for his parole violation hearing. (Tr2. 422.)  At that

13

second meeting, on Thursday, October 23, the two shared paperwork regarding their cases, and Ferguson testified that Smith told him that he was attempting to get his case severed from his co-defendant's and expected to "beat the case" because his co-defendant did the shooting and all he did was punch the other guard. (T2. 422.)   Ferguson said he pressed Smith for further information and tried to gain his confidence by sharing his own background because it "didn't sit well with him" that Smith was involved in a robbery in which an "old man" was shot. (Tr2. 425, 427-28, 449.)

According to Ferguson, in his third (second library) meeting with Smith on Friday, October 24, Smith told him that a defense investigator determined that the eye witnesses had seen the crime from a considerable distance, and that this was "a major plus" for the identification defense.   (Tr2. 444.) Ferguson testified that Smith also said that he and his accomplice were seen fleeing by a young police officer, and wondered how the officer could identify them after seven years (T2. 441, 444).   Ferguson further testified that on Saturday, October 25, Smith told him that he was happy that his case had been severed from that of the co-defendant's, but upset with his lawyer, who told Smith that his fee was $20,000, but told

14

Smith's father that it was $25,000. (Tr2. 446-47.) Ferguson further testified that over the course of these library meetings Smith confessed that he and his co-defendant stole a six-figure hospital payroll, that they dropped it in a waiting vehicle, and that a young officer spotted them. (Tr2. 440-41.)

Ferguson stated on direct examination that he had a federal felony conviction which did not appear on the rap sheet the prosecutor had disclosed. (Tr2. 425-27.) The prosecutor then handed defense counsel an additional page which included this conviction. (Id.) Defense counsel cross-examined Ferguson as to that conviction and his broader criminal history, cocaine abuse, and use of multiple identities. (Tr2. 454-59, 477-91, 514-17.) On cross, Ferguson disclosed that he worked as a paid informant for a Brooklyn narcotics detective named Jimmy Irving. (Tr2. 455-58.) At that time, defense counsel moved to strike the informant's testimony on the grounds that "there hasn't been total discovery and an inadequate (sic) background check." (T2. 460.) Defense counsel did not move to suppress or request a hearing on Massiah or Rosario grounds.

The court denied the Defendant's motion to strike Ferguson's testimony, but granted counsel an opportunity to

15

examine Ferguson about his history as an informant outside of the jury's presence. (Tr2. 460.)  At the hearing, Ferguson elaborated on his work for Detective Irving, primarily in 1999 and involving Ferguson being paid by Irving to buy drugs and then convey information regarding who he had made the purchase from, where it was, and the layout of the place in which the purchase occurred. (Tr2. 461-73.)  Following this testimony, defense counsel stated his position that "it is the burden of the District Attorney to affirmatively make more inquiries with Detective Irving or his superiors, whoever the sergeant was the Lieutenant was and to produce some documentation to these monies, undercover buys, however you want to label it and, I think it should have been done prior to the witness taking the stand." (Tr2. 473-74.)  The court directed counsel to continue his cross-examination and the prosecutor to make further inquiries as to Ferguson, including with regard to Detective Irving. (Tr2. 474-75.)  Ferguson testified further regarding his work for Detective Irving but did not disclose any additional work that he had done for the police. (Tr2. 477-86.)

The following day, defense counsel argued that the prosecution had an obligation to clear up the relationship between Ferguson and Irving and that he was not sure that the

16

prosecution could rest without that. (Tr2. 531-32.) The prosecutor stated that she was trying to locate Irving but had not yet been able to contact him, and the Court concluded that the prosecution could rest but that the case could be re-opened if necessary. (Id.)

In summation, the prosecutor emphasized Ferguson's testimony and Smith's confessions including those statements which Ferguson elicited after Ferguson had agreed to testify. (Tr2. 710-14.)

After the jury charge, the prosecutor stated that she had determined that Ferguson was not "a registered confidential informant," that she had still not spoken to Detective Irving, but that Tracy had called Irving's command and she was trying to get in touch with him. (Tr2. 795.) The Court observed that it would take appropriate steps if any additional information surfaced, saying "if it turns out that he was an informant and there is information that somehow affects the testimony, we will have to deal with it." (Tr2. 796.)

On December 2, 2003, the jury asked for read backs of Ferguson's testimony during deliberations (Tr2. 770), and

17

returned its guilty verdict on two counts of Murder in the Second Degree (intentional and felony murder) the following day (Tr2. 804-07). After the verdict, the Court directed the prosecutor to provide the information defense counsel had requested as soon as possible. (Tr2. 809.)

On December 22, 2003, prior to sentencing, defense counsel moved to set aside the verdict,

> based on the last minute introduction of Mr. Ferguson's testimony, in that it would be my suggestion that the defense wasn't given all of the information at the proper time that it should have been. For instance, it wasn't given during the normal Rosario turn over period. I understand that their argument is that this was a late witness that came to their attention, although from the testimony of the witness during the hearing, it was obvious that they had been aware of his existence prior to the start of the trial. Besides not giving us the Rosario or necessary document before the beginning of the trial, they were basically giving us things, dribs and drabs. As we stand here today, I am actually not even sure whether they have given us all of the information that they had initially said they were going to give us. For instance, I'm not – I'm pretty sure that there's been no communication given to me that they had even communicated to the individual detective. I know one detective was contacted by counsel, but I don't think the other detective had ever been contacted. So for the record I am asking that the verdict be set aside because of the improper usage of the jailhouse snitch.

(Tr3. 9.) The prosecutor replied that both defense counsel and the court were aware of the witness, but that she had not spoken

18

to Detective Irving. (Tr3. 9-10.)   The trial judge agreed that it would be best for the State to speak with Irving, and invited the defense to file a post-judgment motion "if something turns up somewhere down the road" with regard to the informant:

> THE COURT: Look, if something turns up somewhere down the road at any time that would suggest that this informant was not what he appeared to be, you're always welcome to make a post judgment motion. It is reasonably clear to me, based upon the quality of the eyewitness testimony in this case, that the jailhouse informant had to be a reasonably important witness.

(Tr3. 11-12.)

Smith was sentenced to two concurrent indeterminate sentences of imprisonment of from twenty years to life.   (Tr3. 21.)

New defense counsel subsequently uncovered parole violation transcripts in which Ferguson discussed additional history regarding his relationship with the police. At a parole hearing on October 1, 2002, over a year prior to Smith's trial, Ferguson testified that he had been supplying information "locally" for approximately four years. (Parole Tr1. 5 (Dkt. No. 21).)   At a parole hearing on November 10, 2003, several weeks prior to Smith's trial, Ferguson testified that on the morning

of September 4, 2003, the day he was arrested for violating his parole for allegedly assaulting his girlfriend, he met with Detective Dellasandro and one other homicide detective because "I do different things for different agencies out in the street and they were going to get me registered with the ATF." (Parole Tr2. 101-02 (Dkt. No. 22).) Ferguson further testified that "I was in the ATF, okay, Downtown Brooklyn, with two homicide detectives that were vouching for me because of the information. I was getting ready to make a phone call on the phone in the ATF office, right there, if Parole would have gave them the okay." (Parole Tr2. 116-17). After that meeting, Ferguson was arrested for violating his parole conditions.

In September of 2005, Petitioner, through counsel, appealed his case, raising four claims before the New York State Supreme Court, Appellate Division, including that the prosecutor's delinquency in identifying Ferguson effectively denied Smith the right to present a defense and confront the prosecution's witness. (Whitehead Decl., Ex. 4 at 15-20 (Dkt. No. 20).) Smith cited to Ferguson's undisclosed parole minutes as an example of what earlier disclosure might have disclosed. (Id. at 18 n.3.) On April 4, 2006 the Appellate Division modified the judgment of conviction, vacating the DNA databank

20

fee and reducing the amounts of the mandatory surcharge and crime victim assistance fees from $200 and $10 to $150 and $5, respectively, but otherwise affirming the judgment. People v. Smith, 812 N.Y.S.2d 512 (N.Y. App. Div. 2006). On June 23, 2006, the New York State Court of Appeals denied petitioner's application for leave to appeal. People v. Smith, 7 N.Y.3d 763 (2006).

On March 21, 2007, Petitioner filed a pro se petition for a writ of habeas corpus with the United States District Court for the Southern District of New York. (Dkt. No. 1.) On July 31, 2007, this Court granted Petitioner's request to withdraw his habeas petition without prejudice in order to allow him to exhaust unexhausted claims in the State courts. (Dkt. No. 6.)

On May 17, 2007, while the federal habeas motion was pending, Smith filed a pro se motion to vacate his conviction pursuant to under NYCPL § 440.10 in the Bronx Supreme Court, and attached the minutes of informant's parole hearing to his reply papers. (Whitehead Decl. Ex. 8.) Among other points, Smith argued that his trial counsel was ineffective for failing to request a missing witness charge on Detective Irving, saying

21

"[i]f, as Mr. William Ferguson declared on the stand, he actually worked as a paid informant for detective Irving, then it was defense counsel's responsibility to properly investigate the facts surrounding Mr. Ferguson's declaration and thereafter, his responsibility to request his production in Court so that he could cross-examine him and verify the veracity of Mr. Ferguson's position, while at the same time serve as someone to either substantiate and/or disprove Mr. Ferguson's contentions." (Id. at 20-21).

In pro se reply papers dated October 11, 2007, petitioner argued, among other points, that he was denied the effective assistance of counsel by the failure to call or request a missing witness charge on Detective Irving, as well as that his due process rights under Brady v. Maryland, 373 U.S. 83 (1964), were violated by the prosecution's failure to disclose Ferguson's entire criminal record, including the minutes of Ferguson's parole hearing. (Whitehead Decl. Ex. 10.) Petitioner argued that the hearing minutes and the information therein "bears on [Ferguson's] credibility" and showed Ferguson's "lack of varacity (sic)" and "willingness and capacity to lie, fabricate and spin his own tales for whatever reason he sees fit." (Id.) However, Petitioner did not contend that Ferguson's

parole hearing minutes supported his claim that he had a history
of working as a government informant. As supporting
documentation, Petitioner attached to his reply papers two pages
of the parole hearing transcript, and three pages of notes of
the parole hearing. (Id.)

Additionally, in pro se papers dated June 5, 2007,
Smith sought a writ of error coram nobis granting him a new
appeal in the Appellate Division including on the grounds that
his appellate counsel was ineffective for failing to raise on
appeal that his trial counsel was ineffective. (Whitehead Decl.
Ex. 6.) The coram nobis petition repeated the same grounds
raised in the Section 440.10 motion. (Id.)

Smith's NYCPL § 440.10 motion was assigned to Justice
Torres, not the trial judge, because the trial judge had been
transferred to Manhattan. In an Order entered November 19,
2007, Justice Torres denied petitioner's pro se Section 440.10
motion. Justice Torres declined to reach the merits of Smith's
claims and ruled that (1) Petitioner was procedurally barred
from asserting his claims of ineffective assistance of counsel
because Petitioner had a direct appeal pending in the Appellate
Division, First Department, and (2) the court would not rule on

23

whether the prosecutor improperly withheld the parole minutes because Smith submitted the minutes with his reply, rather than main papers. (Whitehead Decl. Ex. 11).   While declining to rule on the issue, the court noted that Smith's Brady claim "does not hold water" because the trial record established that Ferguson had been questioned fully regarding his criminal history and as such a hearing is not warranted. (Id.).  Smith moved for leave to appeal.

On March 12, 2008, the State moved for leave to reargue the Court's denial of petitioner's Section 440.10 motion on the grounds that the court had been incorrect in its belief that Petitioner's direct appeal was pending.  (Whitehead Decl. Ex. 12.)  The district attorney requested that Smith's Section 440.10 motion again be denied, but that a corrected opinion issue.  Petitioner did not oppose granting the government reargument, and again asserted that his motion to vacate should be granted. (Whitehead Decl. Ex. 13).

On May 6, 2008, the Appellate Division denied Petitioner's coram nobis application. (Whitehead Decl. Ex. 14.)

24

On July 1, 2008, Judge Torres granted the government's motion to reargue, vacated the previous decision, and denied petitioner's Section 440.10 motion.   (Whitehead Decl. Ex. 15.) With regard to Smith's ineffective assistance claim for failure to call or request a missing witness charge on Detective Irving, the court held the following:

> At issue under this claim is the testimony of Mr. William Ferguson, a prosecution witness and paid informant for Detective Irving.   The Defendant contends that it was defense counsel's responsibility to properly investigate the facts surrounding Mr. Ferguson's responsibilities to Detective Irving and either substantiate or disprove the witness' contentions by calling the detective to the stand or at the least requesting a missing witness charge. Being a Brooklyn Narcotics Detective unassigned to the Defendant's case, the Court strains to see how Detective Irving could provide any noncumulative information relevant to a material issue in the case. This claim does not allege a ground constituting a legal basis for the motion and hence fails.

(Id.)   In deciding Petitioner's claim that the State had failed to turn over Ferguson's entire criminal record and, specifically withheld information about Ferguson's criminal case that was open during the pendency of Smith's trial, the court held "[a]s this Court ruled previously the function of reply papers are to address the opposition and not to raise new issues, hence the parole hearing transcripts are not reviewable. . . It is clear from the record that Mr. Ferguson was questioned in detail about

25

his criminal history up until that open case.  As such
Defendant's motion based on this ground is denied pursuant to
C.P.L. §440.30(4)(c) which indicates that a court may deny a
C.P.L. §440 motion if 'an allegation of fact essential to
support the motion is conclusively refuted by unquestionable
documentary proof.'"  (Id.)


On August 19, 2008, the New York Court of Appeals
denied Petitioner's application for leave to appeal the denial
of his coram nobis application. (Whitehead Decl. Ex. 16.)


Smith then hired an attorney.  In January, 2009,
through counsel, Petitioner filed a second NYCPL § 440.10 motion
in the Bronx Supreme Court.  (Whitehead Decl. Ex. 17.)  In it,
Petitioner claimed that (1) Smith was deprived of effective
assistance when his trial counsel failed to move to suppress or
preclude Smith's statements to Ferguson on Massiah grounds and
consented to commencing trial without receiving the informant's
criminal record and prior statements required to be disclosed
under Brady v. Maryland, 373 U.S. 83 (1964), and People v.
Rosario, 213 N.Y.S.2d 448, 9 N.Y.2d 286, 289 (1961); and (2)
Smith's Brady and Rosario rights were violated by the
prosecutor's failure to disclose Ferguson's status as an

26

"almost" registered confidential informant and Ferguson's parole minutes. (Id.)  The State opposed the motion on the grounds that the trial attorney's omissions were strategic, arguing that (1) the trial attorney failed to make a Massiah motion because he believed that the trial court's allowing him to examine the informant outside the jury's presence "obviated the need for a separate Massiah hearing," and (2) the trial attorney did not request the trial court to sanction the prosecutor for her failure to timely turn over Rosario material because the attorney felt that such a request would have been denied in light of the circumstances and would have been "unhelpful to him and might have only served to aggravate the jury." (Whitehead Decl. Ex. 18.) According to the prosecutor, these assertions were based on conversations with the Defendant's trial attorney, though no affidavit from the trial attorney was submitted. (Id.)

On March 3, 2009, the Appellate Division denied as moot Petitioner's application for leave to appeal the first, November 19, 2007, denial of his Section 440.10 motion on the grounds that that decision had been vacated. (Whitehead Decl. Ex. 19.)

27

On February 8, 2010, Judge Torres denied Petitioner's second NYCPL § 440.10 motion, ruling that Petitioner's claims were procedurally barred, under NYCPL § 440.10(3)(c), because Smith "was in the position to adequately raise all issues he now makes in the previous motion but chose not to." (Whitehead Decl. Ex. 20.)  While the Court stated that it "declines to reach the merits of Defendant's counsel claims" it found that the motion was "meritless" and that Defendant's "bare claims of ineffective assistance do not meet the Strickland" standard. (Id.)  On July 19, 2010, the Appellate Division, First Department, denied Smith's application for leave to appeal the denial of his second NYCPL § 440.10 motion. (Exhibit 21.)

## II.  Conclusions of Law

Smith raises two challenges to his conviction. He first argues that his trial counsel provided ineffective assistance by failing to seek a hearing under Massiah v. United States, 377 U.S. 201; moving to preclude Ferguson's testimony based upon the prosecutor's failure to meet its obligations under People v. Rosario, 9 N.Y.2d 286; or agreeing to begin trial prior to receipt of all Rosario information.  Smith additionally contends that the state prosecutor deprived him of due process by misrepresenting the informant's status as a

government agent as well as by the informant's allegedly perjured testimony. These arguments are addressed in turn.

## I.  The Ineffective Assistance of Counsel Claim

### A. The Standard for Habeas Relief Based on Ineffective Assistance of Counsel

Under the deferential standard of review established by the Antiterrorism and Effective Death Penalty Act of 1996,

> where the petitioner's claim was adjudicated on the merits in State court proceedings, as here, we may only grant habeas relief if the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented.

Ramchair v. Conway, 601 F.3d 66, 72-73 (2d Cir. 2010) (citations and internal quotation marks omitted).

### B.  The Standard for Ineffective Assistance of Counsel

The Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel

29

for his defense." U.S. Const. Amend. VI. The Sixth Amendment
"right to counsel is the right to the effective assistance of
counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).
The Supreme Court has established a two-part test for evaluating
claims of ineffective assistance. Strickland v. Washington, 466
U.S. 668, 687 (1984); accord Morales v. United States, 635 F.3d
39, 43 (2d Cir. 2011). "First, the defendant must show that
counsel's performance was deficient. This requires showing that
counsel made errors so serious that counsel was not functioning
as the 'counsel' guaranteed by the Sixth Amendment."
Strickland, 466 U.S. at 687. "Second, the defendant must show
that the deficient performance prejudiced the defense." Id.
While the defendant must prove both deficient performance and
prejudice, "there is no reason for a court deciding an
ineffective assistance claim to approach the inquiry in the same
order or even to address both components of the inquiry if the
defendant makes an insufficient showing on one." Id. at 697.

Under Strickland's first prong, there is a strong
presumption that the assistance rendered by an attorney is
objectively reasonable. 466 U.S. at 688-89; Roe v. Flores-
Ortega, 528 U.S. 470, 477 (2000) ("[J]udicial scrutiny of
counsel's performance must be highly deferential") (quoting

30

Strickland, 466 U.S. at 689). The performance inquiry accordingly examines the reasonableness of counsel's performance "from counsel's perspective at the time" and "considering all the circumstances." Strickland, 466 U.S. at 688, 689.

In this regard, it is well-settled that "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." Gibbons v. Savage, 555 F.3d 112, 122 (2d Cir. 2009) (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and even strategic choices made after less than complete investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary. Strickland, 466 U.S. at 690-91. Moreover, an attorney is under no obligation "to advance every nonfrivolous argument that could be made." Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001) (citing Evitts v. Lucey, 469 U.S. 387, 394 (1985)); see also Jones v. Barnes, 463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a

31

client would disserve the very goal of vigorous and effective advocacy").

The second Strickland prong requires an affirmative showing of prejudice. 466 U.S. at 694-95; Gueits v. Kirkpatrick, 612 F.3d 118, 122 (2d Cir. 2010).  The petitioner's burden with respect to prejudice is similarly stringent, as he must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; accord United States v. Caracappa, 614 F.3d 30, 46 (2d Cir. 2010).  "[T]here is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." United States v. Cronic, 466 U.S. 648, 659 n.26 (1984).  In applying this standard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Wilson v. Mazzuca, 570 F.3d 490, 507 (2d Cir. 2009).  "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 694.

C.  The Sixth Amendment Standard

32

Once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of the criminal proceedings. Montejo v. Louisiana, 556 U.S. 778, 129 S. Ct. 2079, 2085 (2009); United States v. Wade, 388 U.S. 218, 227–28 (1967). Interrogation by the state constitutes a critical stage for Sixth Amendment purposes. Montejo, 129 S. Ct. at 2085 (citing Massiah v. United States, 377 U.S. at 204–05; United States v. Henry, 447 U.S. 264, 274 (1980)).

With regard to state informants, it is well settled that a defendant is denied "the basic protections" of the Sixth Amendment

> when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.

Massiah v. United States, 377 U.S. at 206. "Once the right attaches, 'the Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel.'" United States v. Rommy, 506 F.3d 108, 135 (2d Cir.

33

2007) (quoting Michigan v. Harvey, 494 U.S. 344, 348 (1990));
see also Montejo, 129 S. Ct. 2079 (2009); Massiah v. United
States, 377 U.S. at 204-05; United States v. Henry, 447 U.S. at
274; cf. Kansas v. Ventris, 556 U.S. 586 (2009) (holding such
evidence is, however, admissible for impeachment purposes).


    The Supreme Court has noted that the "primary concern
of the Massiah line of decisions is secret interrogation by
investigatory techniques that are the equivalent of direct
police interrogation." Kuhlmann v. Wilson, 477 U.S. 436, 459
(1986). Thus, to violate Massiah, law enforcement and their
informant must engage in some affirmative act "beyond merely
listening, that was designed deliberately to elicit
incriminating remarks." Kuhlmann, 477 U.S. at 459.
"[D]eliberate elicitation under the Sixth Amendment 'covers only
those statements obtained as a result of an intentional effort'
on the part of government officials to secure incriminating
statements from the accused." United States v. Rommy, 506 F.3d
at 135 (emphasis in original) (quoting United States v. Stevens,
83 F.3d 60, 64 (2d Cir. 1996)).


    It is likewise well established that "an informant
becomes a government agent . . . only when the informant has

34

been instructed by the police to get information about the particular defendant." United States v. Birbal, 113 F.3d 342, 346 (2d Cir. 1997). The Sixth Amendment is not violated when "whenever—by luck of happenstance—the [Government] obtains incriminating statements from the accused after the right to counsel has attached." Kuhlmann v. Wilson, 477 U.S. at 459 (internal quotation marks and citation omitted).

> The Massiah rule covers only those statements obtained as a result of an intentional effort on the part of the government, so information gotten before the inmates became agents/informants is not protected by the rule. If, however, an informant obtains some initial evidence, approaches the government to make a deal on the basis of that information, and then—with the backing of the government—deliberately elicits further evidence from an accused, the materials gotten after such government contact are properly excluded under the Massiah rule.

United States v. Stevens, 83 F.3d 60 at 64 (emphasis in original). Thus, once an inmate informs the government of a defendant's statements, he becomes a government agent with respect to later elicited statements. See United State v. Henry, 447 U.S. at 271 (holding that even though the informant was given specific instructions not to question Henry about his case, the government had in fact "deliberately elicited" the information from Henry, stating, "[e]ven if the agent's statement that he did not intend that [the informant] would take

35

affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result."); see also Birbal, 1113 F.3d at 346 (implicitly recognizing that the informant became a government agent once he reported the defendant's statements to the government but finding no violation because "[a]s soon as the government became involved, [the informant] stopped asking questions; he simply listened to Birbal's bragging and reported it to the government. As previously noted, there is no constitutional violation in the absence of solicitation.") (citations omitted); accord United States v. Pannell, 510 F. Supp. 2d 185, 191 (E.D.N.Y. 2007).

However, "[t]he Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant." Birbal, 113 F.3d at 346. "[T]o treat every inmate who hopes to cut some future deal as a 'government informant' is to extend the idea behind Massiah far beyond its natural reach, and that we are not willing to do." United States v. Stevens, 83 F.3d at 64. Moreover, the Massiah rule does not apply to statements made completely voluntarily by an accused. Id.

36

(citing <u>United States v. Accardi</u>, 342 F.2d 697, 701 (2d Cir.),
<u>cert. denied</u>, 382 U.S. 954 (1965)).


D. Procedural Bar

Federal courts "will not review a question of federal
law decided by a state court if the decision of that court rests
on state law that is independent of the federal question and
adequate to support the judgment." <u>Coleman v. Thompson</u>, 501
U.S. 722, 729 (1991); <u>see also</u> <u>Messiah v. Duncan</u>, 435 F.3d 186,
195 (2d Cir. 2006); <u>Cotto v. Herbert</u>, 331 F.3d 217, 238 (2d Cir.
2003).   "To bar federal habeas review, however, the state
court's decision must rest not only on an independent procedural
bar under state law, but also on one that is 'adequate to
support the judgment.'"   <u>Murden v. Artuz</u>, 497 F.3d 178, 191-92
(2d Cir. 2007) (quoting <u>Jimenez v. Walker</u>, 458 F.3d 130, 138 (2d
Cir. 2006)).   The question of whether a default discerned by a
state court is sufficiently adequate and independent to preclude
federal habeas review is governed by federal law.   <u>Monroe v.
Kuhlman</u>, 433 F.3d 236, 241 (2d Cir. 2006) (quoting <u>Cotto v.
Herbert</u>, 331 F.3d at 239 ("[T]he question of when and how
defaults in compliance with state procedural rules can preclude
. . . consideration of a federal question is itself a federal
question."); <u>Lee v. Kemna</u>, 534 U.S. 362, 375 (2002) ("[T]he

adequacy of state procedural bars to the assertion of federal questions . . . is not within the State's prerogative finally to decide; rather adequacy is itself a federal question.")). The Second Circuit has summarized the standard for the adequacy of state procedural bars as follows:

> A state procedural bar is "adequate" if it "is firmly established and regularly followed by the state in question" in the specific circumstances presented in the instant case. Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006) (citation omitted). The "guideposts" for analyzing the issue of adequacy, articulated in the context of a procedural default occurring at trial, are:
>
> > (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.
>
> Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (citation omitted). The Cotto guideposts also apply to testing the adequacy of a procedural default raised in a state collateral proceeding. See, e.g., Clark v. Perez, 450 F.Supp.2d 396, 426 (S.D.N.Y. 2006). Because of comity concerns, a decision that a state procedural rule is inadequate should not be made "lightly or

without clear support in state law." Garcia v. Lewis,
188 F.3d 71, 77 (2d Cir. 1999) (citation omitted).


Murden v. Artuz, 497 F.3d at 191-92.   However, "the Cotto
factors are not a three-prong test: they are guideposts to aid
inquiry" and, with regard to analyzing the adequacy of a state
procedural bar, "there is no need to force square pegs into
round holes."  Clark v. Perez, 510 F.3d 382, 391 (2d Cir. 2008)
(citing Monroe v. Kuhlman, 433 F.3d at 242).


     The bar to federal review occurs when the last state
court to review a petitioner's claim clearly and expressly
states that its decision rests on a state procedural bar. See
Harris v. Reed, 489 U.S. 255, 263 (1989); Messiah v. Duncan, 435
F.3d at 195.   Indeed, where a state court has decided a claim on
a procedural ground, the court may reach the merits of the
federal claim in an alternative holding while still foreclosing
federal habeas review. See Harris, 489 U.S. at 264 n.10; Glenn
v. Bartlett, 98 F.3d 721, 725 (2d Cir. 1996), cert. denied, 520
U.S. 1108 (1997); Velasquez v. Leonardo, 898 F.2d 7, 9 (2nd Cir.
1990) ("we are barred from reaching the merits of [the] federal
claims . . . [where] a state court has expressly relied on a
procedural default as an independent and adequate state ground,
even where the state court has also ruled in the alternative on

the merits of the federal claim"). A subsequent order by the state's highest court denying leave to appeal without rendering an opinion does not eliminate the procedural bar. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Where "the last reasoned opinion on the claim explicitly imposes a procedural default, [federal courts] will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." Ylst, 501 U.S. at 803.

A petitioner may overcome the procedural bar if he demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; see also Dretke v. Haley, 541 U.S. 386, 393 (2004) (if a claim is procedurally barred a petitioner my obtain review if he demonstrates "cause and prejudice for the procedural default" or that the "constitutional violation has probably resulted in the conviction of one who is actually innocent of the substantive offense" (citations and internal quotation marks omitted)).

E. Petitioner's Ineffective Assistance of Counsel Claim Is Barred by an Independent and Adequate State Procedural Ground

40

Here, the State argued, and the state trial court agreed, that the Massiah ineffective assistance claims made by Petitioner in his second NYCPL § 440.10 motion were procedurally barred, pursuant to NYCPL § 440.10(3)(c),[3] since he was in a position to raise the Massiah claim in his first NYCPL § 440.10 motion. (Whitehead Decl. Ex. 20.)  While the Court stated that it "declines to reach the merits of Defendant's counsel claims" it concluded that the motion was "meritless" and that Defendant's "bare claims of ineffective assistance do not meet the Strickland" standard (Whitehead Decl. Ex. 20.)

Petitioner claims that he raised his Massiah claim in his first pro se NYCPL § 440.10 motion, and that his attachment of Ferguson's parole hearing minutes to his reply papers implicitly raised that issue. (Pet. Mem. 38-39 (Dkt. No. 13).) However, the record shows that petitioner did not explicitly raise a Massiah claim in either his pro se motion or his pro se reply papers.  Instead, Petitioner argued that his trial counsel was ineffective for failing to object to the prosecutor's summation comments and for failing to seek a missing witness charges on several individuals including Detective Irving.

---

[3]      NYCPL § 440.10(3)(c) states that "the court may deny a motion to vacate a judgment when:" "(c) Upon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so."

41

(Id.)  Petitioner additionally contended that the State violated his rights under Brady in failing to turn over Ferguson's entire criminal record, which prevented him from sufficiently attacking Ferguson's credibility (Whitehead Decl. Ex. 8) – and it was in support of this contention that Petitioner attached excerpts of Ferguson's parole minutes to his reply. (Whitehead Decl. Ex. 10.)  However, he made no mention of Massiah.  Indeed, the excerpt of Ferguson's parole hearing transcripts that Smith attached did not include any discussion of Ferguson's relationship with the police. (Whitehead Decl. Ex. 10.)[4]  Smith's submission on reargument could be read to clarify that his concern was with trial counsel's failure to call Detective Irving, as he knew Ferguson, so that he could testify as to his lack of credibility.  (Whitehead Decl. Ex. 10.)

In  the  context  of  analyzing  the  exhaustion requirement, courts have clarified that there is no obligation that a habeas petitioner in state proceedings cite "chapter and verse of the Constitution," Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 194 (2d Cir. 1982) (en banc).  "A claim has been 'fairly presented' if the state courts are apprised of 'both the factual

---

[4] As such, the Court does not address Petitioner's argument that the state procedural rule in question here is the state court's refusal to consider the probation minutes attached to Petitioner's first 440.10 reply papers, and that there is no regularly enforced New York procedural bar regarding rejection of evidence attached to pro se reply papers.

and the legal premises of the claim [the petitioner] asserts in federal court.'" Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) (quoting Daye, 696 F.2d at 191). "Citing a specific constitutional provision or relying on federal constitutional precedents alerts state courts of the nature of the claim." Id. However, a petitioner can appraise the state court of the constitutional nature of his claims through:

> "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." "In all such circumstances the federal habeas court should assume that the state courts, which are obliged, equally with the courts of the Union, . . . to guard, enforce, and protect every right granted or secured by the Constitution of the United States, have been alerted to consider, and have considered, the constitutional claim."

Smith v. Duncan, 411 F.3d 340, 348 (2d Cir. 2005) (quoting Daye, 696 F.2d at 194.).

At best, Smith's assertion (in his original § 440.10 brief) that his counsel was ineffective because he did not seek a missing witness charge on Detective Irving and failed to "properly investigate the facts surrounding" Ferguson and his testimony, including his work as a "paid informant for Detective

43

Irving" presents facts that suggest a <u>Massiah</u> issue.  (Whitehead Decl. Ex. 8).  From the record it is apparent that the State court could have, when faced with Petitioner's first Section 440.10 motion, addressed an ineffective assistance claim on the basis of counsel's failure to make a <u>Massiah</u> motion.  As such, it is arguable that Smith "substantially complied" with NYCPL § 440.10(3)(c), particularly given "the realities" of his <u>pro se</u> status and that the judge reviewing his Section 440 motions was not the trial judge and was therefore less familiar with the record.  However, the state court found that Smith's <u>Massiah</u> ineffective assistance claim, made in his second Section 440.10 motion, was procedurally barred as previously not raised.  It is well settled that, while the adequacy of a state procedural bar is a question of federal law, in conducting habeas review, federal courts must give due deference to state court determinations of state procedural law.  <u>See</u> <u>Maula v. Freckleton</u>, 972 F.2d 27, 28 (2d Cir. 1992) (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)).  Petitioner cites, and the Court is aware of, no case refusing to apply Section 440.10(3)(c) or a similar state procedural bar on similar grounds.

The state court likewise denied Petitioner's second Section 440.10 motion, which raised the <u>Rosario</u> ineffective

44

assistance claims he now asserts, as procedurally barred as not raised in his first motion.   Petitioner did not assert in his first Section 440.10 motion an ineffective assistance of counsel claim on the basis that his counsel did not seek to preclude Rosario information that was not timely provided.   At best, it could be said that Petitioner raised a Rosario issue indirectly by asserting that the prosecutor failed to turn over the parole minutes prior to trial and that his counsel failed to seek a missing witness charge on Detective Irving.   However, as previously noted, Smith's submission on reargument clarified that his concern with trial counsel's failure to call Detective Irving was that Irving could have testified as to Ferguson's credibility. (Whitehead Decl. Ex. 10.) Similarly, Smith argued that the parole minutes would have further tarnished Ferguson's credibility and additionally that the prosecution's failure to turn over the parole minutes prior to the withdrawal of the plea offer forced him to go to trial.   (Id.)   Again, the parole minutes attached did not discuss Ferguson's relationship with the police.   Thus, while an ineffective assistance claim on the basis of a failure to make a Rosario motion could conceivably have been reached on Petitioner's first Section 440.10 motion, the state court found that that issue was procedurally barred as not previously raised, and this Court finds no sound reason to

45

question that conclusion. See Maula, 972 F.2d at 28.  Moreover, with respect to Ferguson's parole transcripts, the New York Court of Appeals has clarified that parole minutes are not deemed in the control of county prosecutors and so are not subject to the Rosario rule in any event.  People v. Kelly, 88 N.Y.2d 248, 252 (1996) ("We are persuaded and satisfied that records of the State Division of Parole should not generally be deemed to be in the control of 62 county prosecutors, nor of any other prosecutorial office subject to the Rosario rule.")

Petitioner does not deny that NYCPL § 440.10(3)(c) is a regularly followed procedural bar in New York. (Pet. Mem. 38.) Indeed, the Second Circuit has recognized that Section 440.10(3)(c) may operate as an independent and adequate state procedural bar, Murden v. Artuz, 497 F.3d at 191-93, and "district courts in this Circuit have consistently held that C.P.L. § 440.10(3)(c) constitutes an adequate and independent state ground barring habeas review," Rosario v. Bennett, 2002 WL 31852827, at *21 (Report and Recommendation, S.D.N.Y. December 20, 2002) (collecting cases), adopted 2003 WL 151988 (S.D.N.Y. January 21, 2003); see also Collins v. Superintendent Conway, 2006 WL 1114053 at *3 (S.D.N.Y. April 26, 2006); Lamberty v. Schriver, 2002 WL 1226859 at *3 (S.D.N.Y. April 9, 2002); Pujols

46

v. Greiner, 2001 WL 477046 at *6-*7 (S.D.N.Y. May 4, 2001); Ryan
v. Mann, 73 F. Supp. 2d 241, 248 & n.7 (E.D.N. Y. 1998), aff'd
201 F.3d 432 (2d Cir. 1999).


Accordingly, the state court's dismissal of
Petitioner's Section 440.10 motion here is determined to rest on
an independent and adequate state ground.  Because the Appellate
Division subsequently denied Petitioner's application for leave
to appeal from the denial of the Section 440 motion without
comment on the merits (Whitehead Decl. Ex. 21), the trial
court's holding was the last reasoned opinion on petitioner's
claim.  See Nunnemaker, 501 U.S. at 803.


In order for a petitioner to overcome such a
procedural default, he must show sufficient cause, in that "some
objective factor" that impeded his efforts to raise the claim in
state court," and that that factor caused Petitioner to suffer
actual prejudice, McCleskey v. Zant, 499 U.S. 467, 493-94
(1991), in that there was a reasonable probability that the
outcome of the proceeding would have been different, Strickler
v. Greene, 527 U.S. 263, 289-96 (1999).  See Coleman, 501 U.S.
at 750.


47

Here, Petitioner has not asserted cause for his default. Accordingly, the Court need not consider whether Smith suffered prejudice. See Smith v. Murray, 477 U.S. 527, 533 (1986); Engle v. Isaac, 456 U.S. 107, 134, n.43 (1982). Petitioner makes no argument that the failure to consider the claims will result in a fundamental miscarriage of justice. See Coleman, 501 U.S. at 750.

Petitioner's ineffective assistance of counsel claims are accordingly barred.

Were this not the case, however, Smith's Massiah ineffective assistance claim might require a different outcome. It is well settled that once the government singles out the accused to an informant and is aware that the informant has access to the accused, that informant is a government agent with respect to later deliberately elicited statements. See United State v. Henry, 447 U.S. at 271; United States v. Stevens, 83 F.3d at 64; United States v. Pannell, 510 F. Supp. 2d at 191. Here, both parties recognize that Ferguson deliberately elicited statements from Smith after Ferguson met with the police and

48

agreed to testify against Smith.[5]  On each of these occasions,
Ferguson had Smith brought to him in the library by a
corrections officer, and Ferguson testified that during these
meetings he tried to gain Smith's confidence by telling him
about his own case.  That Ferguson appeared as an informant on
the heels of the trial judge's preclusion of Smith's statement
to the police, that the police officers took no notes of their
meeting with Ferguson or Ferguson's initial call to Dellasandro,
and that Ferguson, as an inmate, was able to have Smith brought
to him in the library by a corrections officer all raise serious
questions as to whether the police engaged in an intentional
effort to secure Smith's incriminating statements.  Regardless,
viewing the evidence in the light most favorable to the state,
the record establishes that Ferguson deliberately elicited at
least two of the library statements after agreeing to testify
against Smith,[6] that the detectives were aware that Ferguson had
access to Smith after their meeting, that this was or should
have been apparent to Smith's counsel at trial, and that Smith's
counsel failed to make a Massiah motion to suppress any of the
library statements.  Even under Strickland's deferential
standard, these facts demonstrate a manifest deficiency.  In

---

[5]    As previously noted, the record is not clear whether all three, or only
two, of the library meetings occurred after Ferguson's agreement to testify
against Smith.
[6]    The state makes no argument that Ferguson merely listened in the
library meetings, nor could it on this record.

addition, absent the library statements, due to the quality of the eyewitness testimony as the trial trial judge noted (Tr3. 11-12), Petitioner may well have made a showing of prejudice.

## II.  Petitioner's Due Process Claims

### A.  The Legal Standard

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963) see also Banks v. Dretke, 540 U.S. 668, 695 (2004) ("A rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."). In order to succeed on a Brady claim, a petitioner must show that the suppressed evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. at 281-82. In this context, prejudice means "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have

50

been different." Cone v. Bell, 556 U.S. 449, 129 S. Ct. 1769, 1783 (2009).

Additionally, the Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." U.S. v. Agurs, 427 U.S. 97, 103 (1976); see also Giglio v. United States, 405 U.S. 150, 153 (1972).  The Second Circuit has elaborated this standard as follows:

> In United States v. Wallach, we summarized the materiality standard under Napue, explaining that the question is whether the jury's verdict "might" be altered.  We have interpreted Supreme Court precedent as holding that if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.  This strict standard of materiality is appropriate not just because [such cases] . . . involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.

Drake v. Portuondo, 553 F.3d 230, 241 (2d Cir. 2009) (citations and internal quotation marks omitted).

B.  Petitioner's Due Process Rights Were Not Violated

1. *Ferguson's Parole Transcripts*

Here, the prosecution did not suppress any Brady material that was non-cumulative or otherwise likely to have altered the verdict. The transcripts from Ferguson's parole hearing before the New York State Division of Parole were not in the prosecutor's possession, nor were they in the custody of the District Attorney's Office; they were created by another state agency not connected with Smith's prosecution. In addressing this question in the Rosario context, the New York Court of Appeals has found that prosecutors are not deemed to possess, and therefore do not suppress, parole minutes that are not known to a state prosecutor, People v. Kelly, 88 N.Y.2d at 252, and there appears no reason to reach another result here. Thus, while due diligence on behalf of the prosecutor might have discovered the minutes, absent knowledge or possession of the transcripts, the Court declines to deem them in the prosecutor's possession for Brady purposes.

Moreover, as explained below, the transcripts do not establish that Ferguson was a government agent – of Detective Tracy or Dellasandro or otherwise or with respect to Smith – or otherwise provide evidence absent which Smith was prejudiced. The law does not "automatically require a new trial whenever 'a

52

combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." Giglio v. United States, 405 U.S. 150,153 (1972) (citation omitted).

## 2. Ferguson's Alleged Perjury

Second, Petitioner argues that the prosecutor repeatedly and falsely represented to both the trial court and defense counsel that Ferguson was not a government agent when he elicited admissions from Smith. Petitioner contends that the prosecutor knew, or should have known that her presentation of the informant's testimony was misleading because the informant omitted that just before he elicited the statements from Smith, Detective Dellasandro was facilitating his registration as an informant with the "ATF," presumably the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives.

First, there is no indication that the prosecutor or her office was in possession of the minutes or knew of their existence.

Second, Ferguson's parole hearing minutes do not establish that he, or the prosecutor, was untruthful when they

53

represented that Ferguson had not been acting as a government agent when he elicited incriminating statements from Smith.

Ferguson made little reference during either his initial parole or his revocation hearing to his relationship with New York City detectives. At Ferguson's hearing on October 1, 2002, when he was still incarcerated, he testified that he "came to a realization that [his] life was going not the way [he] wanted it to go. So, [he] implemented a change . . . . I have been giving up information locally . . . for four years." (Parole Tr1. 5.)

At Ferguson's parole revocation hearing, on November 10, 2003, he made a reference to getting "registered" during examination at the hearing about Ferguson's alleged assault of his girlfriend, the asserted reason for his parole revocation:

> [COUNSEL]: When did you first become aware that there was some allegation that you had assaulted her?
>
> MR. FERGUSON: When I went to parole on September 4th. Wait. Did I suspect? No, there was no reasonable - - wait, the morning, the morning of September 4th, I met with two homicide detectives, okay. Two homicide detectives, I met with them at approximately 10 o'clock in Brooklyn. We were then to go - -

54

> [COUNSEL]: What was the meeting about?
>
> MR. FERGUSON: The meeting was about me going - - going to the ATF and being registered with the Alcohol, Firearms and Tobacco. The Alcohol, Tobacco and Firearms in - -
>
> [COUNSEL]: Did that have anything to do with [your girlfriend]?
>
> MR. FERGUSON: Okay. Earlier part of the conversation was Danny - - Danny Dellasandro, okay, who is a homicide detective with the Cocai [sic] Squad, okay, was called by [my girlfriend]. At which time, at which time, Danny Dellasandro called her and in front of me, said to her, that I will not talk to her, contact her, not a problem. She said okay. Now, we - - we discussed our business I do different things for different agencies out in the street and they were going to get me registered with the ATF. Upon which time, they had to contact parole. Parole never told them anything. They just said, just after Mr. Ferguson's finished, have him come in. So, okay, and they got real uptight that - - because they should have brought me in anyway.

(Parole Tr2. 101-02).


Later, while Ferguson was discussing attempts to obtain employment, he stated:

> I went there and tried out and showed them that I could [use] certain tools, cutting glass and everything and I asked him, give me a shot and he said he would. Okay. And at which time, also, too, Your Honor, I do make cases since I don't now what - - okay, and that's what I do, okay. It's a form of giving back, Your Honor. It's my form of giving back, all right, and I have people right here that can validate it, I have names and

55

> I have phone numbers, okay. I was in the ATF,
> okay, Downtown Brooklyn, with two homicide
> detectives that were vouching for me because of
> the information. I was getting ready to make a
> phone call on the phone in the ATF office, right
> there, Parole would have gave them the okay about
> - -

(Parole Tr2. 116-17.)

The final time Ferguson mentioned a relationship with detectives during his testimony at his parole revocation hearing was while he discussed being assisted by "these same detectives" during an eviction from an assertedly illegal apartment. Ferguson testified that

> these same detectives, helped - - helped me with
> the martial [sic], when the martial [sic] came, I
> said, sir, look, I'm totally at a loss here.
> Look, I'm a regular guy, a straight-up guy. Could
> you - - could I call this detective and you talk
> to him and the guy gave me like three hours to
> move stuff.

(Parole Tr2. 120.)

At no point did Ferguson say that he was in the process of becoming registered as an informant for the New York City Police Department, or that he was working on behalf of Detective Tracy, the District Attorney's Office, or the prosecutor in Smith's case. Rather, he said that he first

56

learned about the assault allegations when he met with the homicide detectives so that he could be registered with the ATF. The significance of the statement is further diminished because Ferguson testified that he believed he was being registered with that ATF, a federal law enforcement agency, not the NYPD or the Bronx County District Attorney.

In light of all the evidence, it is not reasonably probable that had the jury known about Ferguson's testimony at his parole hearing, the verdict would have been different, since that testimony was in the main cumulative of the trial testimony. Ferguson's substantial criminal history and use of deceit and multiple identities was well before the jury and provided ample grounds to impeach his credibility. See U.S. v. Basciano, 384 Fed. Appx. 28, 31 (2d Cir. 2010) ("As this court has frequently observed, withheld information is not material in the sense detailed in Kyles if it 'merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.') (quoting United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007)). Moreover, Ferguson testified that he had worked as an informant for Detective Irving in the past and defense counsel had an opportunity to inquire about Ferguson's history as an informant

57

for Irving.  (Tr2. 449-87.)  As such, the jury was informed of Ferguson's past relationship with and work for the police through Irving, if not Dellasandro.  Defense counsel additionally questioned Ferguson's ability to call on his "contacts in the Police Department" in conjunction with his parole violation.  (Tr2. 186-87.)

Because the parole minutes were not in the prosecution's possession and do not reasonably undermine confidence in the jury's verdict, no due process violation occurred here.

## Conclusion

For the reasons set forth above, the petition for a writ of habeas corpus is denied.

Pursuant to 28 U.C.C. § 2253(c), a Certificate of Appealabilty should issue, where a habeas petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c).  The touchstone of such a showing is whether resolution of the petition "was debatable among jurists of reason." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).  A

"substantial showing of the denial of a constitutional right" requires that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issued presented were adequate to deserve encouragement to proceed further." Rhagi v. Artuz, 309 F.3d 103, 106 (2d Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000) (ellipses in original, internal quotation marks omitted)).   In granting a Certificate of Appealability, a district court in this circuit must specify the issue or issues for which it is granted. Blackman v. Ercole, 661 F.3d 161 (2d Cir. 2011).

Because reasonable jurists could debate, a Certificate of Appealability is granted as to Petitioner's ineffective assistance of counsel and due process claims.

It is so ordered.

New York, NY
March  /  , 2012

ROBERT W. SWEET
U.S.D.J.

59