USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-16-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

PATRICK SMITH,

                Petitioner,

   - against -

BRIAN FISCHER

                Respondent.

----------------------------------X

07 Civ. 2966 (RWS)

OPINION

A P P E A R A N C E S:

        Attorney for Petitioner PATRICK SMITH

        EPSTEIN & WEILD
        225 Broadway, Suite 1203
        New York, New York 10007
        By:  Lloyd Epstein, Esq.

        Attorneys for Respondent BRIAN FISCHER

        BRONX COUNTY DISTRICT ATTORNEY'S OFFICE
        198 East 161st Street
        Bronx, NY 10451
        By:  Robert Johnson, Esq.
            Jason Whitehead, Esq.
            Allen Saperstein, Esq.

**Sweet, D.J.**

Petitioner Patrick Smith ("Mr. Smith" or "Petitioner") has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, opposed by respondent Superintendent Brian Fischer ("Mr. Fischer" or the "Respondent").

The instant matter centers on the testimony of an informant in Petitioner's criminal trial. The issue presented here is whether Petitioner's trial counsel provided ineffective assistance by failing to seek a hearing with respect to the informant, pursuant to *Massiah v. United States*, 377 U.S. 201 (1964).

For the reasons set forth below, Petitioner's motion is granted.

## I. *PRIOR PROCEEDINGS*

By an indictment filed on or about June 5, 2002, a Bronx County Grand Jury charged Petitioner and Kevin Alston ("Alston") with first-degree murder (in the course of a robbery), second-degree murder (intentional and felony murder), first-degree manslaughter, first-degree robbery (armed), and second-degree weapons possession. Prior to trial, defense counsel successfully moved to dismiss four counts of the indictment on

1

statute of limitations grounds and to preclude the use of Petitioner's statement to the police.

On November 18, 2003, the state prosecutor, Ms. Scaccia, announced that she intended to call an informant to testify regarding conversations the two men had while they were incarcerated together at Rikers Island, including that Mr. Smith indicated to the informant that he participated in the crime. (Tr1. 6-7.)[1]  Prompted by this disclosure, the trial judge, Justice Thomas A. Farber, asked the prosecutor whether "[a]t this point, it's your representation that he is not an agent. He was not sent by you or police or anybody else?" (Id.)   The prosecutor responded "No." (Tr1. 7).

Prior to opening statements, on Thursday November 20, 2003, the Court again inquired regarding the informant as follows:

> THE COURT: My understanding is that we still have the matter of the potential witness who is currently incarcerated and we don't have all the information that we need for him; is that right, Miss Scaccia?
>
> MS. SCACCIA: That's correct. I have enough information that I have been able to put in a request for his rap sheet. I do need to speak to the detective that he contacted to determine whether there was any sort of confidential informant relationship between him and

---

[1] The trial transcripts are not paginated consecutively and so are denoted by volume, with volume one, pretrial proceedings, denoted Tr1. [page number], volume two, trial proceedings, denoted Tr2., and volume three, sentencing proceedings, denoted Tr.3.   The docket number and dates of the transcript volumes are as follows:  Tr1. (Dkt. No. 23) (November 18, 2003); Tr2. (Dkt. No. 24, 25, 26, 27) (Nov. 20-21, 2003; Nov. 21, 24-25, 2003; Nov. 26, 2003; Dec. 1-3, 2003); Tr3. (Dkt. No. 28) (Dec. 22, 2003).

this detective or if it was just somebody that he had
a working relationship with.

THE COURT: But based on our discussion yesterday, you
will not refer to him in your opening and there will
be no need to mention that in connection with any of
the witnesses who testify today. . . .

MS. SCACCIA: That's correct.

THE COURT: And so Mr. Bendish, so long as we have that
by tomorrow, that's satisfactory.

MR. BENDISH (defense counsel): Yes, your Honor.  I
think, Judge, the record should also reflect Miss
Scaccia gave me Grand Jury minutes which I had not
received and also rep sheets of the witnesses that she
intends to call.  So I believe other than the inmate,
I think she has completed Rosario obligations.

THE COURT: Obviously, if any issues arise, we will
deal with them as they come up.  It's always nice when
there aren't since Rosario obligation does commence
right about now.

(T2. 3-4.)

Following opening statements the same day, defense counsel,
Mr. Bendish, requested an outer time frame for a decision
regarding whether the State was going to call the informant,
later identified as William Ferguson ("Mr. Ferguson"), and that
he did not "want it to be like they give it to me in the morning
and he is taking the stand in an hour and a half."  (Tr. 37.)
The prosecutor stated that the informant would not be testifying
before the next week. (*Id.*) The Court responded, "I assume that
you will have all the information tomorrow; right.  There is no

3

reason why you shouldn't."   (*Id.*)   The prosecutor stated that "[t]he only thing I may not have by tomorrow is Detective Dellasandro's[2] position as to whether or not he was a C.I." (Tr2. 37.)   The Court assured defense counsel that he would have the name of the informant and his rap sheet by the next day, November 21, 2003.   The prosecutor said she would probably not be able to meet with the detective until the next Monday or Tuesday, November 24 or 25, and defense counsel expressed concern that he might not be informed of the State's decision as to whether she would call the informant until after that point. (Tr. 37-38.)   The Court responded that the prosecutor would know "on Monday whether there is any reason to believe that the [informant] is a C.I. or is getting a benefit of any kind for testifying or is a agent or anything like that.   And then we will deal with it."   (Tr. 38.)   Defense counsel accepted this outcome, saying "[o]kay."   (*Id.*)

The following Monday November 24, the prosecutor disclosed what she stated was the informant's complete rap sheet. (T2. 221.)   She stated that she had been unable to contact Detective Dellasandro ("Det. Dellasandro"), whom the informant had initially contacted, and that she did "not believe at this point

---

[2]  The detective's name is spelled in a variety of ways throughout the transcripts and by the parties.   The Court adopts "Dellasandro" for ease and has altered quotations from the transcripts accordingly.

just from looking at his rap sheets that he was a confidential informant but I am obviously not going on what I believe. I will find out for sure and tell counsel." (*Id.*) Defense counsel acknowledged receipt of the rap sheet and asked "that if there were any notes taken of his interview or interviews by either Detective Tracy or any other detective or the Assistant D.A. that they be turned over as soon as possible." (Id.) The Court responded, "[c]learly, I am not going to permit you to call him until we are satisfied that everything is turned over well ahead of time." (*Id.*) The prosecutor confirmed this, stating "Absolutely." (*Id.*)

At the end of the eyewitness testimony, defense counsel asked, if the State called Mr. Ferguson, for "affirmative proof" that the informant was not "an agent." (T2. 391.) The Court stated, "I believe that you are prepared to make that representation, is that correct?" (*Id.*) The following colloquy then took place:

> MS. SCACCIA: Absolutely, that he was clearly not an agent and he was not sent in there to speak in any way with the defendant by the police or by our office. And, in fact, that he contacted, he contacted the Police Department who then contacted Detective Tracy, this case detective, because he was the one assigned to the case. I have not even, at this point, met Mr. Ferguson. I did not send him in there. He is not a registered confidential informant.

5

THE COURT:   Do we know how it is that he came in contact with the detective he came in contact with? Why he called him as opposed to any other detective?

MS. SCACCIA:  The detective that he called is a detective by the name of Dellasandro. And I believe that Detective Dellasandro has been involved with him regarding Brooklyn arrests. I mean he reached out to him because he obviously knew who he was.  I don't know, I know that he's not his confidential informant. If he knows him it's because he's locked him up on one of his 26 arrests or because he works, he lives, or is known to frequent the precinct, that I can't answer you, but he reached out to the police.

MR. BENDISH:   Judge, again, I am not, I am speaking from a little bit without knowing how many times this guy allegedly even talked to my client.   I mean I don't have any idea whether, you know, he went in there once and he might have called this guy and the guy said, well, when you see him again, ask him about - I don't know.  I have no idea, so I'm asking before we actually put him on the stand that we have some definitive statement by the prosecutor.   And I am not asking for it now because I recognize she hasn't talked to the guy but it seems to me that she hasn't talked to the Brooklyn detective either so . . .

MS. SCACCIA:   It's my understanding that the call was made by the inmate to the detective.  After that call was made to the Brooklyn Detective Dellasandro, he reached out for Detective Tracy.  Detective Tracy then went and spoke to Mr. Ferguson himself.  I believe it was the following day.

THE COURT:   Okay and did Detective Dellasandro take any notes about this?  He must have.

MS. SCACCIA:  Detective Dellasandro?

THE COURT:  Yes.

MS. SCACCIA:  That I don't want to say.  I don't know the answer to that.

6

THE COURT:   Do you have Detective Dellasandro coming in tomorrow?

MS. SCACCIA:   I did not, no.

MR. BENDISH:   There's a gap there.   I don't know how Dellasandro all of a sudden would come up with Tracy.

THE COURT:   That's not, I mean he finds out who the homicide investigator detective is.

MR. BENDISH:   Again, Judge, I am not asking for answers now, but it would seem to me that we are not even sure how many times they're saying he allegedly spoke to the client.   Obviously, if it's more than once, that there may be, that he was sent in the second time and either at the suggestion --

MS. SCACCIA:   He wasn't sent in.   That's the whole issue, he wasn't sent in.   If I were to send him in --

MR. BENDISH:   The Assistant D.A. is speaking without any personal knowledge of that, so I am asking for an offer of proof so that we can have somebody to say that.

MS. SCACCIA:   Actually, I am speaking not out of turn because when I became aware of this, there was some question by the detective, my detective, to me and from Dellasandro, is there anything we can do to send him in there?   And you know what, it was my choice not to try to have anybody wired up or put in the microphone room because unless the person just sat there as a mute and let Mr. Smith do the talking then he would be acting as my agent, and I wouldn't be able to use that statement any way the conversation had taken place.   No further steps were taken to send Mr. Ferguson back in as a plan to try to get either defendant.   He made the statements to the defendant. Counsel has a position that these were not statements made by the defendant but rather this was found out by the other inmate by going through paperwork.   That's his position.   He is allowed to have it.   That is not the sense I am getting from the conversations my detective had with the individual.   I will be in this courthouse by probably 9:30, 9:45 tomorrow awaiting

7

Mr. Ferguson's arrival because I mean he is incarcerated. . . . As soon as he gets here, I want to speak to him. As soon as I speak to him, I will run down prior to 11:30 and I will tell counsel everything I have found out.

MR. BENDISH: Again, Judge, I am just, I have no problem with that, but as long as there's an offer of proof before he physically takes the stand, and then we will go from there.

THE COURT: All right, we can do that. It does occur to me that it's not unlikely that when an inmate calls a detective, that the detective has his pen out. I mean it would be rather foolish, it seems to me, even in light of Rosario rules for a detective on a telephone call like this not to at least write down some information.

MS. SCACCIA: I am pretty certain he had to write at least Patrick Smith down someplace so he could remember who it was when he was calling around to the case detective.

MR. BENDISH: Wouldn't I be entitled to that? That's why I don't understand where the gap is if there's an unknown detective in Brooklyn who somehow has a prior connection to this guy.

THE COURT: I think you ought to be speaking to Detective Dellasandro.

MS. SCACCIA: I will. I will. And if need be, I will get him here for these purposes, or I will have him fax his notes. I will get as much information as I possibly can.

THE COURT: Okay. If we need to, we can put Detective Tracy on at 11:30 and call the inmate after lunch.

MR. BENDISH: Again, I have no problem. Just, I will put on the record now that I want an offer of proof. I understand that we're going to do [it] in the morning.

8

MS. SCACCIA:   An offer of proof that what the inmate would say?

MR. BENDISH:    I think it's incumbent upon the prosecutor to say that I talked to people and I have firsthand knowledge other than double hearsay.   She never talked to anybody.   She hasn't hasn't (sic) talked to the inmates.   So her statements, while I have no reason to believe they are not accurate at this point, I ask for an offer of proof and for them to call this witness, there has to be more on the record.

THE COURT:   Okay.   Obviously, Miss Scaccia is not going to call the witness unless she knows that she actually heard or believed in good faith that he heard something directly from Mr. Smith but you have to make whatever inquiry you have to make in person to rule out any Rosario or agent problems.

(Tr2. 391-97.)

The next day the prosecutor reported that she had spoken with Detective Dellasandro and learned that Mr. Ferguson called Detective Dellasandro and told him that Patrick Smith had told him about a robbery homicide.   (Tr2. 404.)   Dellasandro, according to the prosecutor, looked up Mr. Smith in the computer and determined that Detective Tracy was in charge of Mr. Smith's case and reached out to him on October 21, 2003.   (Tr2. 405.) Tracy returned his call the next day, October 22, 2003, and that day Dellasandro and Tracy went to Rikers Island and spoke with Mr. Ferguson. (Tr2. 405.)   Neither officer made any notes of the interview, and according to the prosecutor, that was the first and last conversation that Mr. Ferguson had with Tracy prior to

9

trial.   (Tr2. 405).   She asserted that Mr. Ferguson "knew of
Detective Dellasandro but this witness was not a confidential
informant."  (Tr2. 406.)

The prosecutor acknowledged that Mr. Ferguson had provided
law enforcement with information in the past, but that the only
prior instance concerned a murder, and that the information
never went anywhere. (Tr2. 408.)   Defense counsel repeatedly
stated that he would like to know how accurate the information
was that Mr. Ferguson previously provided and whether Mr.
Ferguson's previous statements to the police were made to
Dellasandro.  (Tr. 408-11.)  After a discussion, the trial judge
concluded that his understanding was that the only time Mr.
Ferguson had provided information in the past was "in connection
with an incident [wherein] he acted more or less as conduit as
opposed to giving his own information," but the court was not
clear whether Mr. Ferguson provided that information to
Dellasandro.   (Tr2. 411.)   The prosecutor briefly left the
courtroom to speak to Mr. Ferguson.  (Tr2. 411.)   When she
returned, Scaccia explained that, according to Mr. Ferguson, in
2001 while he was incarcerated, another inmate approached him
about killing that inmate's wife.  Mr. Ferguson then reached out
to Detective Lanigan, whom he had grown up with, and Lanigan
introduced him to Detective Dellasandro, Lanigan's partner.

10

(Tr2. 412.)   Mr. Ferguson was then removed from the situation and an undercover officer was introduced to the inmate with whom he had spoken about the murder.   (Tr2. 412.)   However, Mr. Ferguson was not called upon to testify and received no benefit. (*Id.*)

Based on the prosecution's representations, the Court determined that "[t]here is no indication on the record that this individual is engaged as an agent with the People or police or state in any way . . . ." (Tr2. 413.)   Defense counsel stated, "I assum[e] the representations made by the inmate to prosecution is correct.  I will have to live with that."  (*Id.*) The Court responded "I agree.  So right now it's basically on you for cross-examination and if something comes out that changes what we know, there will be consequences that we will have to deal with then up to and including mistrial.  But at this point, there is no reason to suspect that's going to happen."  (*Id.*)

At trial, Mr. Ferguson testified that Mr. Smith and he first met at the Rikers Island medical clinic several weeks before the trial.   (Tr2. 421.)   At that first meeting, the men had a five or ten minute conversation in which Mr. Smith told Mr. Ferguson what he was charged with. (Tr2. 496.)

11

Mr. Ferguson testified that he met with Mr. Smith on three consecutive evenings later that week, on Thursday, Friday, and Saturday (October 23, 24, and 25, 2003). (Tr2. 445-6.)   On each of these occasions, Mr. Ferguson was in the law library and asked a corrections officer to bring Mr. Smith down to the library, which Mr. Ferguson testified he was able to make possible because he had a job at Rikers and the corrections officer would accommodate him. (T2. 443.) Mr. Ferguson testified that following the second meeting (the first in the law library), which he stated occurred on a Thursday (October 23), he contacted Detective Dellasandro.   (Tr2. 509-12.)   However, Detective Tracy testified that he and Detective Dellasandro met with Mr. Ferguson on Wednesday, October 22. (Tr2. 591-93.)   The trial testimony thus conflicts as to the timing of Mr. Ferguson's meeting with the police.

Mr. Ferguson testified that Tracy, Dellasandro, and two other detectives interviewed him regarding Mr. Smith and asked him if he would testify, and Mr. Ferguson agreed. (Tr2. 449-53.) He stated that neither the police nor the Assistant District Attorney asked him to attempt to get Mr. Smith to speak or take any of his paperwork or act as an informant in any way, and that he was receiving no benefit from his testimony.   (Tr2. 451-52.)

12

Mr. Ferguson testified that the first library meeting occurred three or four days after the clinic meeting, when Mr. Ferguson had Mr. Smith called to the law library where he was preparing for his parole violation hearing. (Tr2. 422.)  At that second meeting, on Thursday, October 23, the two shared paperwork regarding their cases, and Mr. Ferguson testified that Mr. Smith told him that he was attempting to get his case severed from his co-defendant's and expected to "beat the case" because his co-defendant did the shooting and all he did was punch the other guard. (T2. 422.)  Mr. Ferguson said he pressed Mr. Smith for further information and tried to gain his confidence by sharing his own background because it "didn't sit well with him" that Mr. Smith was involved in a robbery in which an "old man" was shot. (Tr2. 425, 427-28, 449.)

According to Mr. Ferguson, in his third (second library) meeting with Mr. Smith on Friday, October 24, Mr. Smith told him that a defense investigator determined that the eye witnesses had seen the crime from a considerable distance, and that this was "a major plus" for the identification defense. (Tr2. 444.) Mr. Ferguson testified that Mr. Smith also said that he and his accomplice were seen fleeing by a young police officer, and wondered how the officer could identify them after seven years (T2. 441, 444).  Mr. Ferguson further testified that on

13

Saturday, October 25, Mr. Smith told him that he was happy that his case had been severed from that of the co-defendant's, but upset with his lawyer, who told Mr. Smith that his fee was $20,000, but told Mr. Smith's father that it was $25,000. (Tr2. 446-47.) Mr. Ferguson further testified that over the course of these library meetings Mr. Smith confessed that he and his co-defendant stole a six-figure hospital payroll, that they dropped it in a waiting vehicle, and that a young officer spotted them. (Tr2. 440-41.)

Mr. Ferguson stated on direct examination that he had a federal felony conviction which did not appear on the rap sheet the prosecutor had disclosed. (Tr2. 425-27.) The prosecutor then handed defense counsel an additional page which included this conviction. (*Id.*) Defense counsel cross-examined Mr. Ferguson as to that conviction and his broader criminal history, cocaine abuse, and use of multiple identities. (Tr2. 454-59, 477-91, 514-17.) On cross, Mr. Ferguson disclosed that he worked as a paid informant for a Brooklyn narcotics detective named Jimmy Irving. (Tr2. 455-58.) At that time, defense counsel moved to strike the informant's testimony on the grounds that "there hasn't been total discovery and an inadequate (sic) background check." (T2. 460.) Defense counsel did not move to suppress or request a hearing on *Massiah* or *Rosario* grounds.

14

The court denied the Defendant's motion to strike Mr.
Ferguson's testimony, but granted counsel an opportunity to
examine Mr. Ferguson about his history as an informant outside
of the jury's presence. (Tr2. 460.)   At the hearing, Mr.
Ferguson elaborated on his work for Detective Irving, primarily
in 1999 and involving Mr. Ferguson being paid by Irving to buy
drugs and then convey information regarding who he had made the
purchase from, where it was, and the layout of the place in
which the purchase occurred. (Tr2. 461-73.)   Following this
testimony, defense counsel stated his position that "it is the
burden of the District Attorney to affirmatively make more
inquiries with Detective Irving or his superiors, whoever the
sergeant was the Lieutenant was and to produce some
documentation to these monies, undercover buys, however you want
to label it and, I think it should have been done prior to the
witness taking the stand."  (Tr2. 473-74.)   The court directed
counsel to continue his cross-examination and the prosecutor to
make further inquiries as to Mr. Ferguson, including with regard
to Detective Irving. (Tr2. 474-75.)   Mr. Ferguson testified
further regarding his work for Detective Irving but did not
disclose any additional work that he had done for the police.
(Tr2. 477-86.)

15

The following day, defense counsel argued that the prosecution had an obligation to clear up the relationship between Mr. Ferguson and Irving and that he was not sure that the prosecution could rest without that. (Tr2. 531-32.) The prosecutor stated that she was trying to locate Irving but had not yet been able to contact him, and the Court concluded that the prosecution could rest but that the case could be re-opened if necessary. (*Id.*)

In summation, the prosecutor emphasized Mr. Ferguson's testimony and Mr. Smith's confessions including those statements which Mr. Ferguson elicited after Mr. Ferguson had agreed to testify. (Tr2. 710-14.)

After the jury charge, the prosecutor stated that she had determined that Mr. Ferguson was not "a registered confidential informant," that she had still not spoken to Detective Irving, but that Tracy had called Irving's command and she was trying to get in touch with him. (Tr2. 795.) The Court observed that it would take appropriate steps if any additional information surfaced, saying "if it turns out that he was an informant and there is information that somehow affects the testimony, we will have to deal with it." (Tr2. 796.)

On December 2, 2003, the jury asked for read backs of Mr. Ferguson's testimony during deliberations (Tr2. 770), and

returned its guilty verdict on two counts of Murder in the Second Degree (intentional and felony murder) the following day (Tr2. 804-07). After the verdict, the Court directed the prosecutor to provide the information defense counsel had requested as soon as possible. (Tr2. 809.)

On December 22, 2003, prior to sentencing, defense counsel moved to set aside the verdict,

> based on the last minute introduction of Mr. Ferguson's testimony, in that it would be my suggestion that the defense wasn't given all of the information at the proper time that it should have been. For instance, it wasn't given during the normal Rosario turn over period. I understand that their argument is that this was a late witness that came to their attention, although from the testimony of the witness during the hearing, it was obvious that they had been aware of his existence prior to the start of the trial. Besides not giving us the Rosario or necessary document before the beginning of the trial, they were basically giving us things, dribs and drabs. As we stand here today, I am actually not even sure whether they have given us all of the information that they had initially said they were going to give us. For instance, I'm not – I'm pretty sure that there's been no communication given to me that they had even communicated to the individual detective. I know one detective was contacted by counsel, but I don't think the other detective had ever been contacted. So for the record I am asking that the verdict be set aside because of the improper usage of the jailhouse snitch.

(Tr3. 9.) The prosecutor replied that both defense counsel and the court were aware of the witness, but that she had not spoken to Detective Irving. (Tr3. 9-10.) The trial judge agreed that

17

it would be best for the State to speak with Irving, and invited

the defense to file a post-judgment motion "if something turns

up somewhere down the road" with regard to the informant:

> THE COURT: Look, if something turns up somewhere
> down the road at any time that would suggest that
> this informant was not what he appeared to be,
> you're always welcome to make a post judgment
> motion. It is reasonably clear to me, based upon
> the quality of the eyewitness testimony in this
> case, that the jailhouse informant had to be a
> reasonably important witness.

(Tr3. 11-12.)

Mr. Smith was sentenced to two concurrent indeterminate

sentences of imprisonment of from twenty years to life. (Tr3. 21.)

New defense counsel subsequently uncovered parole violation

transcripts in which Mr. Ferguson discussed additional history

regarding his relationship with the police. At a parole hearing on

October 1, 2002, over a year prior to Mr. Smith's trial, Mr. Ferguson

testified that he had been supplying information "locally" for

approximately four years. (Parole Tr1. 5 (Dkt. No. 21).) At a parole

hearing on November 10, 2003, several weeks prior to Mr. Smith's

trial, Mr. Ferguson testified that on the morning of September 4,

2003, the day he was arrested for violating his parole for allegedly

assaulting his girlfriend, he met with Detective Dellasandro and one

other homicide detective because "I do different things for different

agencies out in the street and they were going to get me registered

18

with the ATF."   (Parole Tr2. 101-02 (Dkt. No. 22).)   Mr. Ferguson

further testified that "I was in the ATF, okay, Downtown Brooklyn,

with two homicide detectives that were vouching for me because of the

information.   I was getting ready to make a phone call on the phone

in the ATF office, right there, if Parole would have gave them the

okay."  (Parole Tr2. 116-17).   After that meeting, Mr. Ferguson was

arrested for violating his parole conditions.

In September of 2005, Petitioner, through counsel, appealed

his case, raising four claims before the New York State Supreme

Court, Appellate Division, including that the prosecutor's

delinquency in identifying Mr. Ferguson effectively denied Mr.

Smith the right to present a defense and confront the

prosecution's witness.   (Whitehead Decl., Ex. 4 at 15-20 (Dkt.

No. 20).)   Mr. Smith cited to Mr. Ferguson's undisclosed parole

minutes as an example of what earlier disclosure might have

disclosed.   (*Id.* at 18 n.3.) On April 4, 2006 the Appellate

Division modified the judgment of conviction, vacating the DNA

databank fee and reducing the amounts of the mandatory surcharge

and crime victim assistance fees from $200 and $10 to $150 and

$5, respectively, but otherwise affirming the judgment.   *People

v. Smith*, 812 N.Y.S.2d 512 (N.Y. App. Div. 2006).   On June 23,

2006, the New York State Court of Appeals denied petitioner's

19

application for leave to appeal. *People v. Smith*, 7 N.Y.3d 763 (2006).

On March 21, 2007, Petitioner filed a *pro se* petition for a writ of habeas corpus with the United States District Court for the Southern District of New York. (Dkt. No. 1.) On July 31, 2007, this Court granted Petitioner's request to withdraw his habeas petition without prejudice in order to allow him to exhaust unexhausted claims in the State courts. (Dkt. No. 6.)

On May 17, 2007, while the federal habeas motion was pending, Mr. Smith filed a *pro se* motion to vacate his conviction pursuant to under NYCPL § 440.10 in the Bronx Supreme Court, and attached the minutes of informant's parole hearing to his reply papers. (Whitehead Decl. Ex. 8.) Among other points, Mr. Smith argued that his trial counsel was ineffective for failing to request a missing witness charge on Detective Irving, saying "[i]f, as Mr. William Ferguson declared on the stand, he actually worked as a paid informant for detective Irving, then it was defense counsel's responsibility to properly investigate the facts surrounding Mr. Ferguson's declaration and thereafter, his responsibility to request his production in Court so that he could cross-examine him and verify the veracity of Mr. Ferguson's position, while at the same time serve as someone to

20

either substantiate and/or disprove Mr. Ferguson's contentions."
(*Id.* at 20-21).

In *pro se* reply papers dated October 11, 2007, Petitioner argued, among other points, that he was denied the effective assistance of counsel by the failure to call or request a missing witness charge on Detective Irving, as well as that his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1964), were violated by the prosecution's failure to disclose Mr. Ferguson's entire criminal record, including the minutes of Mr. Ferguson's parole hearing. (Whitehead Decl. Ex. 10.) Petitioner argued that the hearing minutes and the information therein "bears on [Ferguson's] credibility" and showed Mr. Ferguson's "lack of varacity (sic)" and "willingness and capacity to lie, fabricate and spin his own tales for whatever reason he sees fit." (*Id.*)   However, Petitioner did not contend that Mr. Ferguson's parole hearing minutes supported his claim that he had a history of working as a government informant.   As supporting documentation, Petitioner attached to his reply papers two pages of the parole hearing transcript, and three pages of notes of the parole hearing. (*Id.*)

Additionally, in *pro se* papers dated June 5, 2007, Mr. Smith sought a writ of error coram nobis granting him a new appeal in the Appellate Division including on the grounds that

21

his appellate counsel was ineffective for failing to raise on appeal that his trial counsel was ineffective. (Whitehead Decl. Ex. 6.)   The coram nobis petition repeated the same grounds raised in the Section 440.10 motion. (*Id.*)

Mr. Smith's NYCPL § 440.10 motion was assigned to Justice Torres, not the trial judge, because the trial judge had been transferred to Manhattan.   In an Order entered on November 19, 2007, Justice Torres denied petitioner's *pro se* Section 440.10 motion.   Justice Torres declined to reach the merits of Mr. Smith's claims and ruled that (1) Petitioner was procedurally barred from asserting his claims of ineffective assistance of counsel because Petitioner had a direct appeal pending in the Appellate Division, First Department, and (2) the court would not rule on whether the prosecutor improperly withheld the parole minutes because Mr. Smith submitted the minutes with his reply, rather than main papers. (Whitehead Decl. Ex. 11). While declining to rule on the issue, the court noted that Mr. Smith's *Brady* claim "does not hold water" because the trial record established that Mr. Ferguson had been questioned fully regarding his criminal history and as such a hearing is not warranted. (*Id.*).  Mr. Smith moved for leave to appeal.

On March 12, 2008, the State moved for leave to reargue the Court's denial of petitioner's Section 440.10 motion on the

22

grounds that the court had been incorrect in its belief that Petitioner's direct appeal was pending. (Whitehead Decl. Ex. 12.) The district attorney requested that Mr. Smith's Section 440.10 motion again be denied, but that a corrected opinion issue. Petitioner did not oppose granting the government reargument, and again asserted that his motion to vacate should be granted. (Whitehead Decl. Ex. 13.)

On May 6, 2008, the Appellate Division denied Petitioner's coram nobis application. (Whitehead Decl. Ex. 14.)

On July 1, 2008, Judge Torres granted the government's motion to reargue, vacated the previous decision, and denied petitioner's Section 440.10 motion. (Whitehead Decl. Ex. 15.) With regard to Mr. Smith's ineffective assistance claim for failure to call or request a missing witness charge on Detective Irving, the court held the following:

> At issue under this claim is the testimony of Mr. William Ferguson, a prosecution witness and paid informant for Detective Irving. The Defendant contends that it was defense counsel's responsibility to properly investigate the facts surrounding Mr. Ferguson's responsibilities to Detective Irving and either substantiate or disprove the witness' contentions by calling the detective to the stand or at the least requesting a missing witness charge. Being a Brooklyn Narcotics Detective unassigned to the Defendant's case, the Court strains to see how Detective Irving could provide any noncumulative information relevant to a material issue in the case. This claim does not allege a ground constituting a legal basis for the motion and hence fails.

23

(*Id.*)  In deciding Petitioner's claim that the State had failed to turn over Mr. Ferguson's entire criminal record and specifically withheld information about Mr. Ferguson's criminal case that was open during the pendency of Mr. Smith's trial, the court held "[a]s this Court ruled previously the function of reply papers are to address the opposition and not to raise new issues, hence the parole hearing transcripts are not reviewable. . . It is clear from the record that Mr. Ferguson was questioned in detail about his criminal history up until that open case. As such Defendant's motion based on this ground is denied pursuant to C.P.L. §440.30(4)(c) which indicates that a court may deny a C.P.L. §440 motion if 'an allegation of fact essential to support the motion is conclusively refuted by unquestionable documentary proof.'"  (*Id.*)

On August 19, 2008, the New York Court of Appeals denied Petitioner's application for leave to appeal the denial of his coram nobis application. (Whitehead Decl. Ex. 16.)

Mr. Smith then hired an attorney.  In January, 2009, through counsel, Petitioner filed a second NYCPL § 440.10 motion in the Bronx Supreme Court.  (Whitehead Decl. Ex. 17.)  In it, Petitioner claimed that (1) Mr. Smith was deprived of effective assistance when his trial counsel failed to move to suppress or preclude Mr. Smith's statements to Mr. Ferguson on *Massiah*

24

grounds and consented to commencing trial without receiving the
informant's criminal record and prior statements required to be
disclosed under *Brady v. Maryland*, 373 U.S. 83 (1964), and
*People v. Rosario*, 213 N.Y.S.2d 448, 9 N.Y.2d 286, 289 (1961);
and (2) Mr. Smith's *Brady* and *Rosario* rights were violated by
the prosecutor's failure to disclose Mr. Ferguson's status as an
"almost" registered confidential informant and Mr. Ferguson's
parole minutes. (*Id.*)   The State opposed the motion on the
grounds that the trial attorney's omissions were strategic,
arguing that (1) the trial attorney failed to make a *Massiah*
motion because he believed that the trial court's allowing him
to examine the informant outside the jury's presence "obviated
the need for a separate *Massiah* hearing," and (2) the trial
attorney did not request the trial court to sanction the
prosecutor for her failure to timely turn over *Rosario* material
because the attorney felt that such a request would have been
denied in light of the circumstances and would have been
"unhelpful to him and might have only served to aggravate the
jury." (Whitehead Decl. Ex. 18.) According to the prosecutor,
these assertions were based on conversations with the
Defendant's trial attorney, though no affidavit from the trial
attorney was submitted. (*Id.*)

25

On March 3, 2009, the Appellate Division denied as moot Petitioner's application for leave to appeal the first, November 19, 2007, denial of his Section 440.10 motion on the grounds that that decision had been vacated. (Whitehead Decl. Ex. 19.)

On February 8, 2010, Judge Torres denied Petitioner's second NYCPL § 440.10 motion, ruling that Petitioner's claims were procedurally barred, under NYCPL § 440.10(3)(c), because Mr. Smith "was in the position to adequately raise all issues he now makes in the previous motion but chose not to." (Whitehead Decl. Ex. 20.) While the Court stated that it "declines to reach the merits of Defendant's counsel claims" it found that the motion was "meritless" and that Defendant's "bare claims of ineffective assistance do not meet the *Strickland*" standard. (*Id.*) On July 19, 2010, the Appellate Division, First Department, denied Mr. Smith's application for leave to appeal the denial of his second NYCPL § 440.10 motion. (Exhibit 21.)

The Petitioner then filed an amended petition for a writ of habeas corpus on December 3, 2010, raising the same two claims of ineffective assistance of counsel that he raised in the second N.Y.C .P.L § 440.10 motion. Petitioner did not assert cause for his procedural default of his *Massiah* claim in state court. (Dkt. No. 12).

26

In an opinion dated March 1, 2012, this Court denied the
Petitioner's habeas corpus petition. *See Fischer,* 2012 WL
695432. In the March 1 Opinion, the Petitioner's *Massiah* claim
was found to be procedurally barred because the state court had
denied that claim due to the Petitioner's failure to raise it in
his first collateral motion and because the Petitioner had not
asserted cause for his default in state court. *Id.* at *17–20.
The ruling determined that the state court's decision rested on
an independent and adequate state ground, which barred federal
review. *Id.* at *19.  Further, in denying the Petitioner's due
process claim, the Court noted that the prosecutor did not
possess any "material that was non-cumulative or otherwise
likely to have altered the verdict" since "prosecutors are not
deemed to possess, and therefore do not suppress, parole minutes
that are not known to a state prosecutor." *Id.* at *20. The March
1 Opinion also stated that "Ferguson's parole hearing minutes do
not establish that, he, or the prosecutor, was untruthful when
they represented that Mr. Ferguson had not been acting as a
government agent when he elicited incriminating statements from
[the Petitioner.]" *Id.* at *21.

On March 22, 2012, the Petitioner moved this Court to
reconsider, pursuant to Rule 59 of the Federal Rules of Civil
Procedure, its denial of his habeas corpus petition based on the

27

Supreme Court's decision in *Martinez v. Ryan,* --- U.S. ----, 132

S.Ct. 1309 (2012).  On January 25, 2013, this Court granted

Petitioner's motion to reconsider, recognizing *Martinez* to

establish that,

> Where, under state law, claims of ineffective assistance of
> trial counsel must be raised in an initial review
> collateral proceeding, a procedural default will not bar a
> federal habeas court from hearing a substantial claim of
> ineffective assistance at trial if, at the initial-review
> collateral proceeding, there was no counsel or counsel in
> that proceeding was ineffective.

*Id.* at 1320.  The Court found that the holding in *Martinez* was

applicable to Petitioner's case, and that Petitioner's claim of

ineffective counsel based upon the failure of defense counsel to

suppress the informant's testimony under *Massiah* would be

reconsidered.  *Fischer*, 2013 WL 357604, at *7.

On March 12, 2013, Petitioner submitted a motion in further

support of Petitioner's habeas corpus petition.  This motion was

heard and marked fully submitted on May 22, 2013.

## I. STANDARD OF REVIEW

### A. The Standard for Ineffective Assistance of Counsel

The Sixth Amendment provides that a criminal defendant

"shall enjoy the right ... to have the Assistance of Counsel for

his defense." U.S. Const. Amend. VI. The Sixth Amendment "right

to counsel is the right to the effective assistance of counsel."
*McMann v. Richardson,* 397 U.S. 759, 771 n. 14 (1970). The
Supreme Court has established a two-part test for evaluating
claims of ineffective assistance. *Strickland v. Washington,* 466
U.S. 668, 687 (1984); *accord Morales v. United States,* 635 F.3d
39, 43 (2d Cir.2011). "First, the defendant must show that
counsel's performance was deficient. This requires showing that
counsel made errors so serious that counsel was not functioning
as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,*
466 U.S. at 687. "Second, the defendant must show that the
deficient performance prejudiced the defense." *Id.* While the
defendant must prove both deficient performance and prejudice,
"there is no reason for a court deciding an ineffective
assistance claim to approach the inquiry in the same order or
even to address both components of the inquiry if the defendant
makes an insufficient showing on one." *Id.* at 697.

Under *Strickland's* first prong, there is a strong
presumption that the assistance rendered by an attorney is
objectively reasonable. 466 U.S. at 688-89; *Roe v. Flores-
Ortega,* 528 U.S. 470, 477 (2000) ("[J]udicial scrutiny of
counsel's performance must be highly deferential") (quoting
*Strickland,* 466 U.S. at 689). The performance inquiry
accordingly examines the reasonableness of counsel's performance

29

"from counsel's perspective at the time" and "considering all the circumstances." *Strickland,* 466 U.S. at 688, 689.

In this regard, it is well settled that "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." *Gibbons v. Savage,* 555 F.3d 112, 122 (2d Cir.2009) (citation omitted)." [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and even strategic choices made after less than complete investigation do not amount to ineffective assistance-so long as the known facts made it reasonable to believe that further investigation was unnecessary. *Strickland,* 466 U.S. at 690-91. Moreover, an attorney is under no obligation "to advance every nonfrivolous argument that could be made." *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001) (citing *Evitts v. Lucey,* 469 U.S. 387, 394 (1985)); *see also Jones v. Barnes,* 463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy").

The second *Strickland* prong requires an affirmative showing of prejudice. 466 U.S. at 694-95; *Gueits v. Kirkpatrick,* 612 F.3d 118, 122 (2d Cir.2010). The petitioner's burden with

30

respect to prejudice is similarly stringent, as he must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *accord United States v. Caracappa,* 614 F.3d 30, 46 (2d Cir.2010). "[T]here is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *United States v. Cronic,* 466 U.S. 648, 659 n. 26 (1984). In applying this standard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694; *accord Wilson v. Mazzuca,* 570 F.3d 490, 507 (2d Cir.2009). "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland,* 466 U.S. at 694.

### B.  The Sixth Amendment Standard

Once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of the criminal proceedings. *Montejo v. Louisiana,* 556 U.S. 778 (2009); *United States v. Wade,* 388 U.S. 218, 227-28 (1967). Interrogation by the state constitutes a critical stage for Sixth Amendment purposes. *Montejo,* 129 S.Ct. at 2085 (citing *Massiah v. United States,* 377

31

U.S. at 204-05; *United States v. Henry,* 447 U.S. 264, 274, (1980)).

With regard to state informants, a defendant is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States,* 377 U.S. at 206. "Once the right attaches, 'the Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel.' " *United States v. Rommy,* 506 P.3d 108, 135 (2d Cir.2007) (quoting *Michigan v. Harvey,* 494 U.S. 344, 348 (1990)); *see also Montejo,* 556 U.S. 778 (2009); *Massiah v. United States,* 377 U.S. at 204-05; *United States v. Henry,* 447 U.S. at 274; *cf. Kansas v. Ventris,* 556 U.S. 586 (2009) (holding such evidence is, however, admissible for impeachment purposes).

The Sixth Amendment is not, however, violated when "whenever-by luck of happenstance-the [Government] obtains incriminating statements from the accused after the right to counsel has attached." *Kuhlmann v. Wilson,* 477 U.S. at 459 (internal quotation marks and citation omitted).

> The *Massiah* rule covers only those statements obtained as a
> result of an intentional effort *on the part of the*

32

> *government,* so information gotten before the inmates became
> agents/informants is not protected by the rule. If,
> however, an informant obtains some initial evidence,
> approaches the government to make a deal on the basis of
> that information, and then-with the backing of the
> government-deliberately elicits further evidence from an
> accused, the materials gotten after such government contact
> are properly excluded under the *Massiah* rule.

*United States v. Stevens,* 83 F.3d 60 at 64 (emphasis in
original). Thus, once an inmate informs the government of a
defendant's statements, he becomes a government agent with
respect to later elicited statements. *See United State v. Henry,*
447 U.S. at 271 (holding that even though the informant was
given specific instructions not to question Henry about his
case, the government had in fact "deliberately elicited" the
information from Henry, stating, "[e]ven if the agent's
statement that he did not intend that [the informant] would take
affirmative steps to secure incriminating information is
accepted, he must have known that such propinquity likely would
lead to that result."); *see also Birbal,* 1113 F.3d at 346
(implicitly recognizing that the informant became a government
agent once he reported the defendant's statements to the
government but finding no violation because "[a]s soon as the
government became involved, [the informant] stopped asking
questions; he simply listened to Birbal's bragging and reported
it to the government. As previously noted, there is no
constitutional violation in the absence of solicitation.")

(citations omitted); *accord United States v. Pan nell,* 510 F,
Supp.2d 185, 191 (E.D.N.Y.2007).

## II.  PETITIONER'S CLAIM IS REVIEWED DE NOVO

"Where this Court reaches the merits of a claim that has
not been decided by the state court on substantive grounds . . .
the pre-AEDPA *de novo* standard of review applies." *Santana v.
Brown*, 2013 WL 2641460, at *6 (S.D.N.Y. June 12, 2013); *see also
Connelly v. Senkowski*, 2012 WL 5463915, at *4 (E.D.N.Y. June 8,
2012) ("Since the Appellate Division did not reach the merits of
this claim, this Court's review is *de novo*."); *Sellan v.
Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001) (noting that
"adjudicated on the merits" means "a decision finally resolving
the parties' claims, with *res judicata* effect, that is based on
the substance of the claim advanced, rather than on a
procedural, or other, ground").  Here, in rejecting Petitioner's
C.P.L. §§440.10 motion dated January 6, 2009, the state court
asserted: "[t]his Court declines to reach the merits of
Defendant's counsel claims."  *People v. Smith*, Bronx County
Supreme Court, February 8, 2010 (Judge Torres) ("*People v. Smith
I.*").  The state court ruled instead that Petitioner's claims
were procedurally barred, under NYCPL § 440.10(3)(c), because
Mr. Smith "was in the position to adequately raise all issues he
now makes in the previous motion but chose not to." (Whitehead

34

Decl. Ex. 20.)  The Appellate Division, First Department's order

on July 19, 2010 likewise denied leave to appeal the state

court's decision without any discussion of the merits because it

found that "there [wa]s no question of law or fact presented

which ought to be reviewed."  *People v. Smith*, New York

Appellate Division, July 19, 2010 (Judge Tom) ("*People v. Smith

II*").

The state court's opinion does articulate that, "[t]he

People are correct in their assertion that the instant motion is

procedurally barred and *meritless*," and later after citing the

*Strickland* standard, that the "defendant has failed to provide

any evidence showing that counsel was ineffective."  *People v.

Smith* I, at 4-5 (emphasis added).  These bare references do not

trigger deferential review or undermine the state court's ruling

that it "declines to reach the merits of the case."  *Id.; see

also Aparicio,* 269 F.3d at 93 (in determining whether an opinion

is decided on the merits, courts look to "whether the state

court's opinion suggests reliance upon procedural grounds rather

than a determination on the merits") (quoting *Sellan,* 261 F.3d

at 314).  Additionally, the state court specifies that its

ruling is on procedural grounds and, aside from explicating the

*Strickland* standard, neither mentions a single case in reference

to Petitioner's ineffective assistance claims, nor goes into any

35

of Petitioner's arguments or evidence. *See Cardell v. Fischer*, 2004 WL 2070820, *1 (E.D.N.Y. Sept. 14, 2004) ("[W]here the record does not otherwise preclude the possibility that the claim was denied on procedural grounds" as opposed to on the merits, the claim may be entitled to *de novo* review rather than the deferential standard afforded under AEDPA even when the state court adjudicated the claim on the merits; "rather that attempt to decipher whether the state court ruled on the merits," the court employed a de novo review); *see also Su v. Filion,* 335 F.3d 119, 126 n. 3 (2d Cir.2003) ("[O]ur cases seem to contemplate situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required."); *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003) (holding that "where a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits."); *Aparicio,* 269 F.3d at 93 (quoting *Sellan,* 261 F.3d at 314) ("To determine whether a state court has disposed of a claim on the merits, courts consider: '(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that

36

the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.'"). Accordingly, *de novo* review applies.

Alternatively, relief is appropriate even under the more deferential standard of 28 U.S.C. § 2254. Under 28 U.S.C. § 2254, Mr. Smith's entitlement to federal habeas relief turns on showing that the state court's resolution of his claim of ineffective assistance of counsel under *Strickland v. Washington*, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005). An "unreasonable application" occurs when a state court "identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith, supra,* at 520, 123 S.Ct. 2527 (quoting *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (opinion of O'Connor, J.)). That is, "the state court's decision must have been [not only] incorrect or erroneous [but] objectively unreasonable." *Wiggins v. Smith, supra,* at 520-521, 123 S.Ct.

37

2527 (quoting *Williams v. Taylor, supra,* at 409, 120 S.Ct. 1495 (internal quotation marks omitted)).

The state court in this case did not articulate its rationale for denying Petitioner's claim and only explained that, "defendant has failed to provide any evidence showing that counsel was ineffective." *People v. Smith* I., at 4-5. If the state court's reasoning were to be construed as a merits analysis, "when a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent." *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) (internal citations omitted); *accord Aeid v. Bennett,* 296 F.3d 58, 62 (2d Cir.), *cert. denied,* 537 U.S. 1093, 123 S.Ct. 694, 154 L.Ed.2d 641 (2002). Because the state court's decision rejecting Petitioner's ineffective-assistance claim "involved an unreasonable application of[] clearly established Federal law," Petitioner would still be entitled to relief even under 28 U.S.C. § 2254. *See Williams v. Taylor*, 529 U.S. 362, 363 (2000) (petitioner was entitled to habeas relief because lower court "failed to evaluate the totality of, and to accord appropriate weight to, the available mitigation evidence.").

38

### III. PETITIONER HAS ESTABLISHED INEFFECTIVE COUNSEL UNDER *STRICKLAND*

Petitioner argues that his trial counsel provided ineffective assistance by failing to seek a hearing under *Massiah v. United States*, 377 U.S. 201 (1964), to suppress certain statements elicited from Mr. Smith, and that these statements (the "library statements" or "library conversations") prejudiced Petitioner under *Strickland*'s "prejudice" prong.

Under *Strickland*'s first prong, to determine whether a counsel's conduct is deficient, "[t]he court must ... determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 687. Though this was not an instance where Petitioner's counsel failed at all points to provide adequate representation, counsel's failure to even alert the court to the *Massiah* issue, which pertained to substantial evidence in the case, raises constitutional concerns.

The *Massiah* issue in this case is straightforward. It is well settled that once the government singles out the accused with an informant and is aware that the informant has access to the accused, that informant is a government agent with respect to later deliberately elicited statements. *See United State v.*

39

*Henry,* 447 U.S. at 271; *United States v. Stevens,* 83 F.3d at 64; *United States v. Pannell,* 510 F.Supp.2d at 191.   Here, Petitioner's defense counsel was aware, and indeed Mr. Ferguson testified at trial (*see* Tr.2 449-53), that Mr. Ferguson had agreed to testify for the prosecution before deliberately eliciting at least the second two library conversations from Mr. Smith.[3]   Mr. Ferguson's testimony on this issue was enough that defense counsel knew, or should have been aware, that a *Massiah* violation had occurred and that the statements should be suppressed.   Despite this knowledge, defense counsel asked only for a hearing on Mr. Ferguson pertaining to his history as an informant, and never moved to exclude Mr. Ferguson's testimony under *Massiah* or its progeny. *See Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994) ("[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.").   The record before us does not articulate any strategic considerations

---

[3] As previously noted, the record is not clear whether all three, or only two, of the library meetings occurred after Mr. Ferguson's agreement to testify against Smith. *Smith,* 2012 WL 695432, at *19 n.5.  During trial, however, Mr. Ferguson testified on direct examination "that the law library meetings with Petitioner took place on three consecutive days - Thursday, Friday, and Saturday . . . which were October 23, 24, 25 of 2003." (District Attorney's Main Brief, "DA Br.", at 11.)   Det. Tracy testified that he received a telephone message from Det. Dellsandro on Wednesday, October 22, 2003, and that they both went to interview Ferguson that same day." (*Id.*)

accounting for counsel's failure to raise this pivotal issue,[4]
nor could counsel provide any plausible explanation for
neglecting to move to exclude such damning testimony. *See
Jackson v. Leonardo,* 162 F.3d 81, 86 (2d Cir. 1998) (writ of
habeas should be granted without a hearing from the defense
counsel in the "highly unusual case where no plausible
explanation for an attorney's actions exists").

As this Court found in the March 1 opinion,

On each of these occasions, Ferguson had Smith brought to
him in the library by a corrections officer, and Ferguson
testified that during these meetings he tried to gain
Smith's confidence by telling him about his own case. That
Ferguson appeared as an informant on the heels of the trial
judge's preclusion of Smith's statement to the police, that
the police officers took no notes of their meeting with
Ferguson or Ferguson's initial call to Dellasandro, and
that Ferguson, as an inmate, was able to have Smith brought
to him in the library by a corrections officer all raise
serious questions as to whether the police engaged in an
intentional effort to secure Smith's incriminating
statements. Regardless, viewing the evidence in the light
most favorable to the state, the record establishes that
Ferguson deliberately elicited at least two of the library

---

[4] The State, in opposing Petitioner's motion in state supreme court, argued
that the trial attorney strategically decided not to make a *Massiah* motion
because he believed that the trial court's allowing him to examine the
informant outside the jury's presence "obviated the need for a separate
*Massiah* hearing." (Whitehead Decl. Ex. 18.)  However, no affidavit from the
trial attorney was submitted.  Additionally, examining the informant as to
his prior history as an informant would have no impact on counsel's ability
to raise the *Massiah* issue; as soon as Mr. Ferguson testified that he had
agreed to testify against Mr. Smith before deliberately eliciting further
information from Petitioner, counsel knew or should have known that a *Massiah*
violation had occurred and should have moved to suppress the subsequent
statements.

statements after agreeing to testify against Smith,[5] that
the detectives were aware that Ferguson had access to Smith
after their meeting, that this was or should have been
apparent to Smith's counsel at trial, and that Smith's
counsel failed to make a *Massiah* motion to suppress any of
the library statements. Even under *Strickland's* deferential
standard, these facts demonstrate a manifest deficiency.

*Smith*, 2012 WL 695432, at *19.

Indeed, in *United States v. Henry*, 447 U.S. 264 (1980), the

Supreme Court found a *Massiah* and Sixth Amendment violation in

analogous circumstances.  In *Henry*, a fellow inmate Nichols, a

paid informant for the government, had "some conversations with

Henry while he was in jail and Henry's incriminatory statements

were the product of these conversations."   *Id.* at 271.  Even

though the government insisted that they did not instruct the

informant to question Henry about the robbery, the Supreme Court

explained that "even if the government did not intend that [the

informant] would take affirmative steps to secure incriminating

information . . . [they] must have known that such propinquity

likely would lead to that result. . . . When the accused is in

the company of a fellow inmate who is acting by prearrangement

as a Government agent . . . [c]onversations stimulated in such

circumstances may elicit information that an accused would not

intentionally reveal to persons known to by Government agents."

---

[5] Respondent makes no argument that Mr. Ferguson merely listened in the
library meetings, nor could it on this record.

*Id.* n.8.   The Supreme Court also noted that given "the powerful psychological inducements to reach for aid when a person is in confinement[,] . . . the mere fact of custody imposes pressures on the accused" and should factor into *Massiah* considerations. *Id.* at 274.   Ultimately, the Court found that because the informant had an agreement with the government and was "intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel," and because the informant was not merely a "passive listener" but using his fellow inmate status "as a person sharing a common plight" to gain Henry's confidence, a *Massiah* violation had occurred.   *Id.* at 273-7; 264 n. 12.

Similarly here, though the detectives maintain that they did not affirmatively ask Mr. Ferguson to elicit more information, the detectives knew that Mr. Ferguson had access to Mr. Smith and should have "known that such propinquity likely would lead to that result."   *Id.* at 274.   Additionally, Mr. Ferguson was already under agreement to testify against Mr. Smith when he intentionally brought Mr. Smith to the library two or three additionally times to elicit more information.[6]   Far from a passive listener, Mr. Ferguson admitted that he "pressed

---

[6] Mr. Ferguson had also been supplying information "loyally" to the police for approximately four years and was "nearly" an ATF agent.   (Parole Trl. 5 (Dkt. No. 21).)

43

Smith for information and tried to gain his confidence by
sharing his own background." (Tr2. 425, 427-8.) Defense
counsel's awareness of this information and subsequent failure
to move under *Massiah* to exclude this testimony thus falls
outside the "wide range of professionally competent assistance,"
*Strickland*, 466 U.S. at 690, and the state court finding
otherwise involved an unreasonable application of clearly
established law. *See Lindstadt v. Keane*, 239 F.3d 191, 205 (2d
Cir. 2001); *see also Grate v. Stinson*, 224 F. Supp. 2d 496, 520
(E.D.N.Y. 2002) (because it was constitutional error for
defendant's counsel not to raise a claim available and essential
to the defense, it was "erroneous" and "unreasonable" for state
court to reject defendant's *Strickland* claim and the petition
for writ of habeas was granted).

Respondent's cited precedent that no *Massiah* violation
occurred is either inapposite, or confirms that Mr. Ferguson was
in fact acting as an agent. For instance, in *United States v.
Pannell*, 510 F. Supp. 2d 185 (E.D.N.Y. 2007), the court wrote
that a *Massiah* violation occurs when a "government informant . .
. deliberate engaged in elicitation." *Pannell*, 510 F. Supp. 2d
at 189. In contrast, Respondent's other cited precedent shows
only that informants are not agents where there was not an
agreement with the government to cooperate or testify against

44

the defendant, and where the defendants spontaneously initiated contact with the informants and the informants were mere "listening posts." *See, e.g.*, *United States v. Birbal*, 113 F.3d 342 (2d Cir. 1997) (the informant was not a government agent because he had not been asked to get information from the defendant and there was no "solicitation"); *Thomas v. Cox*, 708 F.2d 132, 135-7 (4th Cir. 1983) (informant was not an "agent" of the government because he "had made no proper 'arrangement' with the Commonwealth to procure information from *or testify against* the accused" and contact by the informant was "self-initiated") (emphasis added); *United States v. Stevens*, 83 F.3d 60, 64 (2d Cir. 1996) (allowing testimony from informants where, though informants were promised financial compensation, the government told informants to be mere "listening posts" and not to affirmatively initiate contact; instead, the defendant initiated conversations with the informants and "spontaneously" offered information). As discussed, here Mr. Ferguson had already agreed to testify before the library conversations, and admits that he deliberately brought Mr. Smith to the library with the purpose of eliciting information from him. *See Smith*, 2012 WL 695432, at *19.

Respondent next asserts that even if there were a *Massiah* violation, Petitioner's counsel was not ineffective because he

45

did conduct what was effectively a "*Massiah*" hearing. *See Massiah v. United States,* 84 U.S. 201 (1964).   The record shows, however, that defense counsel only questioned Mr. Ferguson in a short hearing outside the presence of the jury about his history as an informant as an objection to a lack of total discovery on the informant by the prosecution. (Tr2. 460.)   In addition, after the verdict, defense counsel moved to suppress Mr. Ferguson's testimony solely on the basis that the prosecution had been inadequate in turning over full discovery materials relating to Mr. Ferguson.   (Tr3. 9.)   At no point did defense counsel ask that Mr. Ferguson's testimony be suppressed under *Massiah* or its progeny, or say anything that would alert the court to the *Massiah* issue as it stood.[7]   Petitioner is therefore correct that counsel failed to appreciate the legal significance of the *Massiah* issue, *see Smith v. Fischer*, No. 07 Civ. 2966 (RWS), 2013 WL 357604, at *8 (S.D.N.Y. Jan. 25, 2013), and that this failure fellow below an objective standard of reasonableness.   *See Strickland*, 466 U.S. at 690.

---

[7] Whether Mr. Ferguson was an agent was briefly discussed before trial. However, defense counsel maintained that "as long as there's an offer of proof before [the informant] physically takes the stand" from the prosecution that Mr. Ferguson was not an agent, that was "sufficient."  (Tr2. 391-97.) Defense counsel did not re-raise the issue at any point during or following the trial, including after Mr. Ferguson testified as to his agreement with the detectives and his further solicitation of information from Mr. Smith.

With respect to *Strickland*'s second prong, the state court was "objectively unreasonable" in its application of *Strickland* prejudice for two independent reasons. First, the state court's opinion incorrectly cited the standard for prejudice regarding pleas, instead of trials: "the prejudice prong, on whether counsel's constitutionally ineffective performance affected the outcome of the *plea process* . . . [Mr. Smith] must show that there is a reasonably probability that, but for counsel's errors, he would not have *pled guilty* and would have insisted on going to trial." (*People v. Smith* I., at 5)(emphasis added).

Second, due to the weaknesses in the eyewitness testimony, which the trial judge noted (Tr3. 11-12), and the lack of any scientific or physical evidence linking Mr. Smith to the crime, Petitioner has shown a "reasonable probability" that he would have been acquitted but for his counsel's failure to suppress Mr. Ferguson's testimony under *Massiah*. *See Smith*, 2012 WL 695432, at *19. Aside from Mr. Ferguson's testimony as to Mr. Smith's confessions, the evidence at trial consisted of eyewitnesses whose descriptions of the perpetrators were inconsistent with that of Mr. Smith, and whose memories had faded over the seven years between the crime and the trial. (Petitioner Memorandum ("Pet. Mem."), at 4-5.) Mr. Smith was not arrested until six years after the crime, and there was no

47

physical or scientific evidence tying him to it.  Given the
limited evidence aside from the informant's testimony, the
prosecutor emphasized Mr. Ferguson's statements in summation,
including those statements which Mr. Ferguson elicited after he
had agreed to testify. (Tr2. 710-14.)  During deliberations, the
jury asked for read backs of Mr. Ferguson's testimony on
December 2, 2003 and returned its guilty verdict the following
day. (Tr2. 770.) The state court judge who tried the case
observed, "[i]t is reasonably clear to me, based upon the
quality of the eyewitness testimony in this case, that the
jailhouse informant had to be a reasonably important witness."
*Smith*, 2012 WL 695432, at *9.

In similar situations, courts in this circuit have found
*Strickland* prejudice.  In *Harrison v. Cunningham*, 2013 WL
627723, at *2 (2d Cir. Feb. 21, 2013), for instance, the Second
Circuit affirmed the district court in granting petitioner's
habeas petition, finding prejudice under *Strickland*, where, even
though the chief witness and arresting officer "asserted that
there was a hundred percent no doubt in [his] mind that the
defendant had committed the crime," because of the "absence of
physical evidence tying [the defendant] to the crime, the proof
in th[e] case turned on each witness's credibility. . . . Given
the critical importance of the relevant testimony to the central

issue before the jury" which counsel's errors prevented, the
Second Circuit held that "no court could justifiably find that
there was not even a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different."  *Id*; *see also Frankos v. Sendowski*,
937 F. Supp. 227, 233-234 (S.D.N.Y. 1996) (finding the following
factors relevant to whether counsel deficiently allowing
testimony is prejudicial under *Strickland*: "the importance of
the witness' testimony in the prosecution's case, whether the
testimony was cumulative, the presence or absence of evidence
corroborating or contradicting the testimony of the witness on
material points, the extent of cross-examination otherwise
permitted, and, of course, the overall strength of the
prosecution's case.").

Given the similar critical importance of Mr. Ferguson's
testimony to the central issue before the jury in this case, no
court could justifiably find that there was not a "reasonable
probability" that, but for defense counsel's failure to suppress
Mr. Ferguson's testimony, Mr. Smith might have been acquitted.
*Strickland*, 466 U.S. at 694.

Respondent contends that if the first library conversation
took place before Mr. Ferguson spoke to the government and
became an "agent," which the record remains unclear on, then

49

there would be no *Massiah* violation and statements from that
initial library conversation would remain.  Respondent further
asserts that because the initial conversation would be admitted,
the second two library conversations would be harmless error and
thus no prejudice occurred from counsel failing to raise the
*Massiah* issue.

However, even if the first library conversation were
allowed, the second two statements were not harmless error.  In
the first library conversation, Mr. Ferguson was looking at Mr.
Smith's paperwork, and Mr. Smith said that he was trying to
"beat the case" because his co-defendant did the shooting and
all he did was punch the guard.  In the second two library
conversations, Mr. Smith articulated specific details about his
case that could not be determined from the paperwork Mr.
Ferguson saw in the initial meetings, including dollar amounts
for Mr. Smith's attorneys and details of the eyewitnesses during
the crime.  *See Smith*, 2012 WL 695432, at *4.

Before trial, defense counsel specified that his position
would be to argue that Mr. Ferguson was lying, that he learned
any information he testified about from the paperwork itself,
and that Mr. Smith had not told him any details of the crime.
*Id.* The details of the statements from the second two library
conversations made this argument futile.  Indeed, instead of

50

being "cumulative" to the original information, the second two
library conversations added details that made Mr. Ferguson
credible and his testimony significantly more damaging.
Additionally, a series of confessions, if made to the same
person, reinforce each other and can be used to assess the
credibility of statements legally obtained.  For instance, in
*Arizona v. Fulminante*, 499 U.S. 279 (1991), the Court determined
that the presence of the first confession affected the
"assessment of [the second confession's] credibility, and hence
the reliability of the second confession might well have been
influenced by the corroborative effect of the erroneously
admitted first confession." *Id.* at 302.  The Court therefore
found that the admittance of the first confession was not
harmless error despite its similarity to the second confession
because it reinforced and made credible the second confession,
especially where the other evidence in the case was limited.
*Id.*  Ultimately, the Court held that although the decision might
have been the same even without the first confession, "it [was]
impossible to say so beyond a reasonable doubt."  *Id.* Similarly
here, there is a "reasonable likelihood" that without Mr.
Ferguson's corroborating testimony of explicit details from the
second two library conversations, testimony which the jury
specifically requested in deliberations and which the

51

prosecution relied heavily on in summations, the jury would have found Mr. Ferguson not credible and Mr. Smith would have been acquitted.  *See Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) (in assessing wrongly admitted testimony's importance, court looked to importance of the testimony and whether "the prosecution has emphasized the wrongly admitted evidence). Thus, regardless of whether the first library conversation occurred before or after Mr. Ferguson agreed to testify, the second two library conversations are sufficient to constitute prejudice under *Strickland*'s second prong.

## IV.   CONCLUSION

For the foregoing reasons, Petitioner's petition for writ of habeas corpus is granted.

It is so ordered.

**New York, NY**
**July /1/, 2013**

ROBERT W. SWEET
U.S.D.J.

53